**BLUEBONNET SAVINGS BANK,**
**et al., Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION, Defendant.**

No. 3:91–CV–1066–X.

United States District Court,
N.D. Texas,
Dallas Division.

June 28, 1995.

McKenna & Cuneo, I. Thomas Bieging, Alexander J. Brittin, Julie M. Williamson, Denver, CO, Gueck, Davis, Seeberger & Siegel, P.C., Jay L. Gueck, Dallas, TX, Patton Boggs, L.L.P., Ronald Liebman, Mitchell R. Berger, Washington, DC, for plaintiff Bluebonnet Sav. Bank, FSB.

Lewis & Roca, Jeremy Butler, Phoenix, AZ, Figari & Davenport, Ernest E. Figari, Dallas, TX, for plaintiffs CFSB Corp. and James M. Fail.

Thomas A. Schulz, Robert G. Clark, Wendy Kloner, F.D.I.C., Washington, DC, George C. Lamb III, Baker & Botts, L.L.P., Dallas, TX, Kirk K. Van Tine, Baker & Botts, L.L.P., Washington, DC, for F.D.I.C.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Before the Court are Plaintiffs CFSB Corporation and James M. Fail's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on Defendant's Counterclaim, filed July 12, 1993; and Plaintiff Bluebonnet Savings Bank's Motion to Dismiss the Counterclaim, or in the Alternative, For Summary Judgment, filed July 12, 1993; and the seemingly endless responses, replies, surreplies, new evidence, and subsequent briefing. After carefully considering the motions, briefs, supporting evidentiary submissions, and applicable law, the Court determines that no issues of material fact exist with respect to the issues raised in the motions for summary judgment. Therefore, Plaintiffs' Motions for Summary Judgment are GRANTED as to the FDIC's counterclaim.

### BACKGROUND

Plaintiffs and the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC")[1] entered into a contract[2] on December 22, 1988, whereby Plaintiffs acquired the assets and liabilities of 15 failed Texas savings and loan associations ("S & Ls"). Bluebonnet Savings Bank ("Bluebonnet") became a federally chartered savings bank insured by FSLIC. The thrifts that became Bluebonnet had been part of the "Southwest

---

1. The members of the FHLBB served as the operating head of the FSLIC and performed the functions of a board of directors for the FSLIC, directing the policy of the FSLIC. Affidavit of M. Danny Wall (former chairman of the FHLBB) of September 30, 1993, at 2.

2. The "contract" consists of an Assistance Agreement, Capital Maintenance Agreement, Forbearance Letter, and other related documents.

Plan,"[3] a FHLBB-adopted program to provide government assistance to induce private capital investors to bail out failed S & Ls in the southwestern United States.[4] Encouraging private investors to recapitalize the S & L industry would save FSLIC billions of dollars by eliminating the need to immediately pay off insured depositors of failed S & Ls. By 1988, the FSLIC lacked sufficient funds to liquidate each failed thrift in the United States.[5]

As a part of the application process, the FHLBB regulations imposed a duty upon potential acquirors to provide complete and correct information regarding their competence, experience and integrity to operate a FSLIC-insured financial institution. Under the National Housing Act, 12 U.S.C. §§ 1730a(e)(2), the FHLBB was required to consider those factors in determining whether to approve an individual's acquisition of a thrift institution. Under the FHLBB regulations, the failure to provide honest and complete disclosure was a ground for the FHLBB to deny a potential acquiror's application. Certain matters, such as felony convictions and indictments, or the knowing assertion of a false or misleading statement, or the omission of relevant information, were considered "presumptive disqualifiers" to an application to acquire control of a thrift institution under 12 C.F.R. § 547.7(g).

In late 1988, Plaintiff Fail, in conjunction with another investor group, bid to obtain the Texas S & L group that would later become Bluebonnet. Fail had previously submitted financial and other information, including a Biographical and Financial Report to the Federal Home Loan Bank in Atlanta ("FHLB–Atlanta"). All potential acquirors had to be "qualified" to obtain control of a thrift institution and be placed on the FHLBB's National Marketing List. The responsibility of the qualification of Fail with respect to the Bluebonnet transaction rested with enforcement people, regulatory and examination people, and corporate securities people and others with the general counsel's office of the Federal Home Loan Bank in Dallas ("FHLB–Dallas").[6] The qualification process included doing a Lexis/Nexis background search on the potential acquiror as well as checking with the FBI, SEC, Department of Justice, and the other bank regulatory agencies.[7]

3. As former FHLBB Chairman Danny Wall described the S & L crisis at the time the Southwest Plan was created, "[w]e were looking down the barrel from the wrong end, of insolvencies that were occurring faster than we could deal with them." The deteriorating financial situation led the FHLBB and FSLIC to aggressively market Southwest Plan thrifts to investors: "we had paid advertisements in various national publications in that timeframe soliciting interest on the part of prospective investors...." *Impact of Restructuring of the S & L Industry: A Case Study on Bluebonnet Savings Bank, Hearings Before the Subcomm. on Antitrust, Monopolies and Business Rights* [hereinafter Senate Subcommittee Hearings], 101st Cong., 2d Sess. 457, 488 (July 31, 1990) (Testimony of M. Danny Wall).

4. During, well, really, my tenure there, the thrift crisis was exploding, if you will. One of my mandates was to seek outside capital for inclusion in the resolution of the troubled thrifts to bring fresh capital, if you will, to the earned industry. One of the mechanisms that I had instituted not only was to seeking private investors, but to also market to them and this investor outreach, it was basically a seminar letting potential investors know that we were interested, helping to explain to them the process to get included on the marketing list.... There was a booklet provided on how to acquire a thrift, and also a document, they could get the documentation on how to get put on the National Marketing List. Deposition Testimony of Thomas L. Batties (FSLIC Director of Marketing) on Nov. 17, 1993, at 58.

5. [In Congressional hearings, FHLBB Chairman] Wall and [FSLIC Director] Root testified that the 1988 thrift rescues saved taxpayers billions by putting out of business some 223 thrifts that long had been insolvent but were continuing to operate because the federal insurance fund for thrifts had gone broke, leaving no money to pay off their depositors.

Lacking cash, the bank board under Wall came up with what was called the Southwest Plan, to persuade private investors to take over failed thrifts in return for various government subsidies lasting for 10 years. Tom Kenworthy and Jerry Knight, *Storm Brews Over '88 S & L Deals; Treasury Official Says Review May Stir "Volcanic Eruption"*, The Washington Post, Aug. 1, 1990.

6. Deposition testimony of M. Danny Wall on Nov. 9, 1993, at 64–65.

7. Deposition testimony of M. Danny Wall on Nov. 9, 1993, at 78–79.

Fail and his representatives were informed in early December 1988 that another investor would be recommended to the FHLBB as the potential purchaser of the Texas S & L group. On or about December 9, 1988, Fail was at FSLIC headquarters in Washington to discuss the purchase of unrelated S & Ls in Kansas. Fail was then informed that the FHLBB was not comfortable with the structure of the other investor's proposal for the Texas S & L group,[8] and was asked if he would be interested in submitting a new proposal for the Texas S & Ls. Fail's bid was economically the best bid submitted to the FHLBB.[9] Significant tax benefits [10] were due to expire by December 31, 1988,[11] so that the Bluebonnet deal, involving some $3.2 billion in assets, was completed in the few days between December 9 and December 22, 1988,[12] when the FHLBB met and approved the transaction.[13]

In 1989 and 1990, Congress held hearings concerning various S & L transactions, including the Bluebonnet transaction. Several senators and representatives who believed the FHLBB and FSLIC had been excessively generous with taxpayer money in funding S & L bailouts were harshly critical of the FHLBB for its approval of Fail and the Bluebonnet transaction. FHLBB members as well as other FHLB and FSLIC officials were questioned at length about these matters during testimony before the Congressional subcommittees. The Congressional "Monday morning quarterbacking" and intense scrutiny of regulatory officials in these hearings received a significant amount of media attention. In response to the criticism, the agencies launched internal investigations into the circumstances surrounding Fail's acquisition of Bluebonnet.

Plaintiffs filed this lawsuit in June 1991, seeking a declaratory judgment as to the proper application of contractual provisions governing the Bluebonnet transaction, as well as damages and other relief, alleging that the FDIC failed to furnish material consideration required by the contract. On June 25, 1993, the FDIC filed its First Amended Counterclaim.[14] The FDIC seeks

**8.** "Negotiations broke down due to questions about the availability of capital and an unacceptable holding company structure proposed by the Weston Edwards group." Senate Subcommittee Hearings 241 (July 9, 1990) (Testimony of former FSLIC Special Assistant to the Executive Director for the Southwest Plan Robert Roe).

**9.** Deposition testimony of M. Danny Wall on Nov. 9, 1993, at 60.

**10.** Assistance Agreement § 9.

**11.** "[T]he tax benefits were going to be cut by 50 percent effective January 1, 1989...." Senate Subcommittee Hearings 622 (July 31, 1990) (Testimony of M. Danny Wall).

**12.** Fail described the additional time pressure caused by the regulators in his testimony before the Senate subcommittee:

On December 8—until December 8, we were out of the Pard [Bluebonnet] package. We were no longer considered bidders at all. Then on the 9th we were told that they would like to negotiate with us additionally.

On the—after 1 week of negotiations, on the 16th of December, which was a Friday, we were told that if we were going to close, we were going to close on the 28th of December. That was the slot that had been picked for the closing of the Pard package.

We went away over the weekend. We came back on Monday, which was the 19th, and were told that, no, the 28th was not the proper closing date; we were going to have to close on the 23d of December. Two hours later they came in and says, no, you've got to close on the 22d of December.

Now, this goes—they moved the closing date from the 28th, which is after Christmas, to the 22d, which is before Christmas. During that time—you know, at this point I'm in a panic because I'm the person that's supposed to come with the cash. I had people going all over the place trying to file all the forms, get the legal documents, all sorts of transactions that had to be completed.

Senate Subcommittee Hearings 298 (Aug. 6, 1990) (Testimony of James M. Fail).

**13.** Approximately 10 S & L transactions similar to Bluebonnet were completed during the month of December 1988. Senate Subcommittee Hearings 622 (Jul. 31, 1990) (Testimony of M. Danny Wall).

**14.** The Court finds curious the timing of the FDIC's counterclaim. The purported nondisclosure of the conviction of Fail's company United Security was explored at length with several witnesses, including Fail, in the Senate subcommittee hearings in July and August 1990. The lawsuit was filed on June 5, 1991, yet the FDIC did not consider this a basis for rescission until its first counterclaim was filed on May 24, 1993, nearly three years after the Senate hearings, and after this Court had ruled against the FDIC on the "Mark" issue in December 1992.

rescission of the Bluebonnet transaction, asserting fraud in the inducement. The Plaintiffs move to dismiss the counterclaim, or alternatively for summary judgment.

## SUMMARY JUDGMENT

██ Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment or partial judgment as a matter of law. Fed.R.Civ.P. 56(c); *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law will identify which facts are material. *Id.* at 248, 106 S.Ct. at 2510. The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Russ v. International Paper Co.*, 943 F.2d 589, 591 (5th Cir.1991), *cert. denied*, 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial. *Page v. DeLaune*, 837 F.2d 233, 239 (5th Cir.1988).

██ When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). In short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Merely colorable evidence or evidence not significantly probative, however, will not defeat a properly supported summary judgment. *Anderson*,

477 U.S. at 249–50, 106 S.Ct. at 2510–11. The existence of a mere scintilla of evidence will not suffice. *Id.* at 252, 106 S.Ct. at 2512. When the nonmoving party fails to make the requisite showing and the moving party has met its summary judgment burden, the movant is entitled to summary judgment. Fed. R.Civ.P. 56(c); *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1119 (5th Cir.1992).

## DISCUSSION

██ The FDIC's counterclaim seeks rescission of the Bluebonnet transaction on the ground of fraud in the inducement because Plaintiff Fail allegedly failed to disclose material information to the FHLBB and the FSLIC prior to the transaction. Under Texas law, the elements of fraud in the inducement are: 1) a representation, 2) that is false, 3) that was made with knowledge of its falsity or recklessly without any knowledge of its truth and as a positive assertion, 4) that was made with the intention that it be acted on by the party, 5) that the party act in reliance upon it, and 6) that he thereby suffered injuries. *Deer Creek Ltd. v. North American Mortgage Co.*, 792 S.W.2d 198, 202 (Tex.App.—Dallas 1990, no writ); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977).

The essence of the FDIC's counterclaim is summarized as follows:

Prior to the submission of Fail's background information to the FHLBB and the FSLIC, both Fail and a company of which he was president and chairman of the board were criminally indicted for fraud. Fail entered into a plea bargain that provided for the criminal conviction of the company, and for the dismissal of the personal indictment against Fail. In addition, the plea bargain provided that neither Fail, nor any company controlled by Fail, could pursue any new insurance business in the State of Alabama. Neither Fail nor his representatives ever disclosed to the FSLIC or the FHLBB the conviction of the company controlled by Fail or the full details of the plea bargain.

In the forms submitted by Fail for the purpose of acquiring control of a FSLIC-insured institution, Fail disclosed his per-

sonal indictment, and the dismissal of the indictment, but did not disclose the fact that the dismissal of the personal indictment was the result of the plea bargain under which the company pled guilty and was convicted of fraud. Fail also did not disclose that two affiliated companies and one individual with whom he was affiliated pled guilty to the charges in the indictment. In addition, Fail did not disclose subsequent administrative proceedings against Fail in Alabama, regarding violations of his plea bargain agreement. In subsequent documents and meetings with representatives of the FHLBB and the FSLIC, Fail and his representatives intentionally misrepresented the facts surrounding his indictment and his company's conviction as part of a scheme to mislead the FHLBB and the FSLIC. Fail and his representatives made false statements to the FHLBB and the FSLIC because, under the FHLBB regulations in effect in 1988, the felony conviction of Fail's company would have been a "presumptive disqualifier" to any acquisition of a FSLIC-insured institution, substantially increasing the likelihood that an application by Fail to acquire a FSLIC-insured institution would be denied.

The FHLBB and the FSLIC were aware of the information Fail provided regarding his indictment, but were unaware of the facts surrounding the contemporaneous conviction of his company and other Fail-related companies.

FDIC's First Amended Counterclaim at 4–5. The Amended Counterclaim sets forth in detail the events referred to above concerning Fail and his companies. The FDIC asserts that, because of this fraud in the inducement, the documents comprising the Bluebonnet transaction are voidable by, and unenforceable against, the FDIC as successor to the FSLIC.

The Plaintiffs counter that there was no misrepresentation, as Fail fully disclosed his indictment and surrounding legal history, and that nothing in it disqualified him from obtaining Bluebonnet. Plaintiffs also assert that there was no reliance on Fail's disclosures because federal regulators conducted their own pre-acquisition background investigation of Fail. Finally, Plaintiffs assert that there was no injury because nothing in Fail's background disqualified him as an acquiror, and that in April 1992 (more than three years after the initial acquisition and two years after the Congressional hearings), FHLBB's successor institution, the Office of Thrift Supervision ("OTS")[15] did not object when Bluebonnet acquired another Texas thrift.

■ Although the stack of the evidence and briefing submitted by the parties exceeds two feet in height, the issue before the Court is simply whether Fail's disclosures about his company's prior criminal history constitute a false representation so that the FSLIC and FHLBB were fraudulently induced to enter into the Bluebonnet transaction. The FDIC relies on the "buried facts doctrine," a concept borrowed from securities law, to assert that, as Fail's disclosures were "buried" in the disclosure materials, these facts have not been disclosed. For example, in *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 201–203 (5th Cir.1988), the Fifth Circuit adopted the reasoning of an earlier Second Circuit case concerning the adequacy of disclosures in documents relied on by the investing public, such as a 10–K form filed with the SEC or a prospectus. The Second Circuit held that, because the purpose of a prospectus is to solicit investment by the general public, and the intended audience encompasses both sophisticated financial analysts and untutored lay persons, if the method of presenting material facts obscures or distorts their significance, such presentation

15. FIRREA substantially modified the overall federal thrift regulatory scheme. It abolished FSLIC and transferred FSLIC's functions to other agencies; created a new thrift deposit insurance fund under FDIC; eliminated FHLBB and replaced it with OTS—an office within the United States Department of the Treasury—and made OTS's Director responsible for the examination, supervision, and regulation of all federally insured savings associations, and the chartering of federal thrifts; and established the Resolution Trust Corporation, charged with resolving certain closed thrifts. *See* 12 U.S.C. 1437 note; 1441a; and 1821. *Security Sav. and Loan v. Director, Office of Thrift Supervision,* 960 F.2d 1318, 1321 n. 8 (5th Cir. 1992).

is a violation of the securities laws. *Green-apple v. Detroit Edison Co.*, 618 F.2d 198, 205, 210 (2d Cir.1980).

As the FDIC has admitted in its briefing, the political fallout from the 1990 Congressional hearings was intense, as regulators and former regulators scrambled to deflect Congress's wrath onto anyone but themselves. Senate Subcommittee Chairman Metzenbaum expressed the belief that FHLBB and FSLIC had blundered terribly with the Bluebonnet deal.[16] Senator Metzenbaum, a Democrat, was also critical of the assistance provided to Fail in the Bluebonnet transaction by lobbyist Robert Thompson, a former advisor to then-Vice President Bush and former special assistant to President Reagan.[17]

Not surprisingly, self-preservation and/or finger-pointing was the operative strategy in the subsequent internal investigations by the regulatory agencies. The president of FHLB–Dallas did not personally review any of the financial and other information provided by Fail, relying on his staff.[18] The FSLIC Deputy Executive Director for the Southwest Plan did not participate personally in the acquiror selection process.[19] The FHLBB Chairman put the burden of reviewing prospective acquirors' information squarely on his staff,[20] but later acknowledged to RTC investigators that the very information allegedly omitted or misrepresented on which the FDIC bases its counterclaim (the conviction of Fail's company, United Security, and resulting fine) *was, in fact, disclosed by Fail in the disclosure package.*[21] The FHLB–Dallas regulatory analyst doing the primary legwork in the Bluebonnet transaction (and an outspoken critic of Fail) had informed his supervisors of the conviction of Fail's company, and was told to focus on Fail personally, and not his companies.[22]

16. "Mr. Metzenbaum is among the members of Congress who say the subsidies paid to entice investors to take over ailing savings institutions were too generous and amounted to a Government giveaway to the affluent." Jeff Gerth, *Misuse of Savings Bailout Reported in Texas Purchase*, N.Y. Times, July 8, 1990.

17. Douglas Frantz, *Former Bush Aide Defends Role in Texas S & L Deal*, Los Angeles Times, Sept. 12, 1990.

18. Q. Just to be clear, prior to the closing of the Bluebonnet transaction, which is a shorthand reference to the transaction, that closed on December 22, 1988, did—you did not personally review any materials that had been submitted by Mr. Fail or Mr. Fail's representatives?

A. I don't recall ever having seen any of that material.

Q. So you don't have an opinion either way whether it [Fail's information] was complete or misleading in this case?

A. You know, I have no personal knowledge. I have not reviewed the information that was delivered to the FSLIC, the Home Loan Bank Board, or the Dallas Bank.
Deposition Testimony of George Barclay on Aug. 25, 1993, at 14–15 and 38.

19. I did not participate in the bidder qualification process for this [Bluebonnet] transaction. I was not on the team that negotiated Mr. Fail's bid and therefore had neither direct involvement nor direct knowledge of the day-to-day negotiations.
Senate Subcommittee Hearings 475 (Jul. 31, 1990) (Testimony of Thomas Lykos).

20. Q. Mr. Wall, what efforts did the Bank Board, its staff, FSLIC, its staff, and the Dallas Bank make before the December 22nd, 1988 vote to read and to understand the materials concerning Mr. Fail's qualifications that had been submitted by or on behalf of Mr. Fail?

A. I have no way of knowing what individuals did, what their efforts were. Their job was to look at the documentation and to understand it and, if they didn't understand it, to ask questions of someone who was senior to them and/or to get answers to those questions from the prospective acquiror.
Deposition Testimony of M. Danny Wall on Nov. 9, 1993, at 68.

21. Q. Did you tell these lawyers acting on behalf of the RTC, when you spoke with them in 1990, that in fact the documents that the Bank Board had before the December 22, 1988 vote to approve Mr. Fail do contain information about a guilty plea entered by a company then controlled by Mr. Fail; namely, United Security?

A. I don't recall that. But I had come to that understanding, yes.
Deposition Testimony of M. Danny Wall on Nov. 9, 1993, at 70–71.

22. Q. Did you limit your questions [of a Fail associate] regarding the conviction to Mr. Fail personally or did you just ask—how did you ask that question?

A. My understanding was Mr. Fail personally. None of Mr. Fail's corporations were buying the institution. The attorneys at the Federal Home Loan Bank of Dallas advised me that my eyes should be focused on Mr. Fail and not on circumspect issues.

Robert Brick, the Director of the Case Marketing Division at FHLB–Dallas in December 1988 and the primary FHLB official responsible for reviewing Fail's qualifications, has also admitted that the information about Fail's company, United Security, was disclosed by Fail:

Q. Were you aware that Mr. Wayne Frena testified before the [Senate] subcommittee?

A. Yes.

Q. Did you watch his testimony?

A. Yes.

Q. Did you tell Mr. Frena, in words or substance, after he had returned from that testimony that with respect to the corporate indictment or the corporate conviction of United Security that in words or substance "We just blew it"?

A. Yes.

Q. And when did you tell him that?

A. When I spoke to him after his testimony. I don't remember the specific date or how soon after the testimony.

Q. And what were your—what were you referring to when you said in words or substance "We just blew it"?

A. I was referring to the fact that the information that we reviewed earlier today was available to us prior to the acquisition and that we didn't recognize the significance of that information.

Deposition Testimony of Robert Brick on Sept. 30, 1993, at 76–77.

Brick elaborated:

The FHLB–Dallas analyst told his superiors about the conviction of Fail's affiliate company but eventually stopped criticizing Fail when he realized his opinions were unwelcome:

Q. Did you tell anyone at the Dallas bank about the guilty plea of the company?

A. Sure.

Q. Who?

A. Bob Brick, Debbie Jenkins, Scott Gesell, George Barclay, Harvey Simon. Anybody that would listen to me. I didn't want this guy to get this deal. I was out lobbying throughout that institution daily to the point where I was irritating Mr. Barclay about it.

Q. Do you recall anything specific about [Frena's] testimony that led you to believe that the Dallas bank "blew it"?

A. He stated words to the effect that we were not aware of the conviction of the related companies.

Q. And, in fact, you knew at that time that that wasn't the case?

A. Yes.

Q. How did you know at that time that that wasn't the case?

A. I recalled seeing it in these documents.

Q. So you were recalling—let me make sure I've got this right. You were recalling at that time having reviewed Brick Deposition Exhibit 3 prior to consummation of the transaction; is that correct?

A. That's correct.

Q. But you didn't make anyone at the Dallas Federal Home Loan Bank or the Federal Home Loan Bank Board or the FSLIC aware of that prior corporate conviction prior to consummation of the transaction?

A. No, I did not.

Q. Why didn't you?

A. I didn't realize the significance of it.

Q. In retrospect, why—have you reached any conclusions as to why at that time you didn't realize the significance of it?

A. In retrospect, my conclusion is that I saw it in the documents, and I assumed that the other reviewers saw it as well. Since no one else brought it up, it didn't occur to me to bring it up. We were focused on the [Fail] indictment.

Deposition Testimony of Robert Brick on Sept. 30, 1993, at 79–81.[23] Clearly, the regu-

Q. So you recall telling Mr. Barclay that the company had—a company of Mr. Fail's had pled guilty?

A. Right. And that's when the lawyers got into it with me about this company doesn't matter. Mr. Fail matters. Focus on Fail. Don't focus on the corporation. Fail had been dismissed with prejudice, and I couldn't hold that against him.

Deposition Testimony of Wayne G. Frena on Sept. 20, 1993, at 40–41 and 55–56.

**23.** Although Brick stated that it was his conclusion that "the information was buried" (Deposition Testimony at 126), he still assumed that the other reviewers had seen the information, as he

lators simply did not consider the criminal history of Fail's company significant at the time, and did not follow up on the information because their focus was on Fail himself.[24] The FDIC asks this Court to hold Fail responsible years after the fact for the regulators' oversight.[25]

The Court finds most persuasive a memo by OTS (successor agency to the FHLBB) Enforcement detailing the findings of its nineteen-month investigation into the Bluebonnet deal. The section entitled "Fail Criminal History" states in relevant part:

In the applications filed by Fail to qualify as an acquiror of a thrift, it appeared that on certain documents Fail did not provide full information concerning his criminal history. However, after receiving sworn testimony and documents from Fail and reviewing OTS documents, Washington Enforcement has determined that in 1988 Fail submitted three application packages to the Bank Board and FSLIC to qualify as a thrift acquiror, and within each of these applications the complete criminal history of Fail and his companies is revealed. In June 1988, Fail sent a package of information which revealed this criminal history to the Atlanta office of the Bank Board in connection with his application to acquire two thrifts in Alabama. This same information was submitted to FSLIC in Washington in September, 1988 in connection with Fail's application to become a qualified bidder under the Southwest Plan. In December 1988, just days before the sale of Bluebonnet to Fail was consummated, Fail once again sent the information revealing his complete criminal history to FSLIC. Thus, after investigation, Washington Enforcement does not believe there is a basis to contend that Fail withheld information concerning his own criminal record or that of any companies controlled.

Recommendation from Therese D. Pritchard, Stephen E. Hart, and Charles H. Fitzpatrick to [OTS Regional Director] Billy C. Wood and [Senior Deputy Chief Counsel] Carolyn Lieberman (May 7, 1992), at 4.[26]

Contrary to the FDIC's counterclaim that Fail misled the FHLBB and FSLIC, the FHLBB's own successors determined after an exhaustive investigation that there was no basis for such an allegation. The OTS finding in May 1992 is especially significant because at that time, *the OTS was also a defendant in this case*, and was sharing confidential documents and other information with its co-defendant, the FDIC.[27] Had

had. His answer to the central issue of the FDIC's counterclaim is as follows:

Q. And it's your testimony that the government had adequate information to assess whether Mr. Fail was an eligible acquiror in December of 1988 prior to the closing of the transaction?

A. Yes.

Deposition Testimony of Robert Brick on Sept. 30, 1993, at 72.

24. Q. Did you ever make any inquiries yourself or instruct anyone else to make any inquiries as to the other parties that were involved in the criminal proceedings in which Mr. Fail was indicted?

A. No, I did not.

Deposition Testimony of Robert Brick on Sept. 30, 1993, at 56–57.

25. The FHLBB's own internal investigation was disparaging of the thrift acquiror selection process:

The lead negotiator did not evaluate all proposals; there was no evidence the FHLBank of Dallas evaluated all proposals or proposal revisions; the FHLBank did not communicate completed evaluations in a timely manner; and due diligence information was not provided to all qualified investors. Such actions compromised the integrity of the acquirer selection process and prevented or discouraged several prospective acquirers from participating in the case resolution process.

Audit Report, FHLBB Office of Inspector General (Sept. 29, 1989), at 9.

26. The 1992 memo affirms the preliminary conclusion about Fail that OTS Enforcement had reached in 1990:

At the outset, the focus of the investigation was on possible misrepresentations by James Fail the owner of Bluebonnet, concerning his criminal history on his applications to acquire Bluebonnet and other thrifts. However, after extensive review of documents, it appears that Fail did make full disclosure of his prior history of both criminal and civil litigation.

Memorandum from Charles H. Fitzpatrick to Stanley M. Hecht [Acting Director, OTS Washington Enforcement] (Dec. 11, 1990).

27. It is the Policy of the FDIC/RTC and OTS to cooperate fully with each other to accomplish our individual missions to investigate and bring related but separate claims involving activities of the same thrifts. Therefore, the agencies have adopted procedures to share in-

there been any factual justification for a claim against Fail of misrepresentation to OTS's predecessor agency, the OTS would have acted in its own best interests and raised the issue in a counterclaim of its own at the time.

Although the criminal history information submitted by Fail not once, not twice, but three times, may not have been presented in the *manner* that the FDIC in hindsight (after stinging Congressional criticism of its predecessor, FSLIC) maintains that it should have been presented, the regulators investigating Fail's disclosures concluded that Fail did not withhold information.[28] Fail may not have highlighted the criminal history, or put it in capital letters, or in bold type, but the information was there.[29] The "buried facts" doctrine in securities law designed to protect the unsophisticated investing public is inap-plicable to the Bluebonnet transaction, where the efforts of a fleet of regulators were marshalled to put together the deal.[30] This is simply a case of people "seeing the light" when they "felt the heat." The Court finds the arguments presented in the FDIC's counterclaim without merit, and pushing the envelope of Rule 11.[31]

The Court concludes that the summary judgment evidence presented fails to raise a genuine issue of material fact with respect to the allegations in the FDIC's counterclaim, so that summary judgment for the Plaintiffs is proper. Whether the information on Fail and his companies was overlooked in the FHLBB's and FSLIC's haste to put together the transaction in thirteen days in December 1988, or they simply did not consider it significant at the time, or they considered it significant and wanted to "get the deal done

vestigatory information and legal analyses to achieve a more efficient and cost effective use of resources and a more effective pursuit of wrongdoing.

Statement of Policy and Procedures Concerning the Sharing of Confidential Information With the Office of Thrift Supervision, attachment to internal FDIC memorandum by FDIC General Counsel Alfred Byrne (May 7, 1991).

28. See OTS Recommendation of May 7, 1992, cited above.

29. The Court finds compelling the testimony of Robert Brick, who was the Director of the Case Marketing Division at FHLB–Dallas in December 1988 and the primary FHLB official responsible for reviewing Fail's qualifications:

Q. Did you tell them [RTC attorneys investigating the Bluebonnet transaction] that Mr. Fail wasn't obligated to wave a red flag?
A. Yes.
Q. What did you mean when you told them that?
A. I meant that the acquirors were obligated to provide accurate information to us, to us, the system, the bank board. It was the responsibility of the bank board to assess that information, and that the acquiror was not obligated to highlight the negative information, simply to provide it.
Q. And in the case of Mr. Fail's application, that negative information was supplied, wasn't it?
A. Yes.
Deposition Testimony of Robert Brick on Sept. 30, 1993, at 74.

30. According to the FHLBB Chairman, there were "dozens, if not over a hundred" FHLB supervisory agents in Dallas and "a few hundred" lawyers on staff with the FHLB in Dallas and FSLIC in 1988 to review information about prospective S & L acquirors. Deposition Testimony of M. Danny Wall on Nov. 9, 1993, at 110 and 118. Before the Senate Judiciary subcommittee, the president of FHLB–Dallas spoke with pride about the FHLB system's regulatory might: "Between 1985 and the enactment of FIRREA in August of 1989, we built up throughout the system a powerful regulatory force with private sector salaries that was more than adequate to the task." Senate Subcommittee Hearings 491 (Jul. 31, 1990) (Testimony of George Barclay).

31. Though the Court's determination is in no way based on his opinion, the Court finds interesting the opinion of FHLB–Dallas regulatory analyst (and Fail critic) Wayne Frena concerning the FDIC's counterclaim:

Q. And have you formed a view about the merits of that counterclaim as you sit here today?

A. Yes, I have.

Q. And what's your view?

A. My view is it's a desperate attempt by the FDIC to subvert this litigation and slow it down, because you've got a partial summary judgment against the FDIC in their original suit and that they are running out of options so they ran out and hired outside fee counsel to slow it down. And also there's a report pending to Congress due at the end of September about the FDIC's Financial Assistance Branch's efforts to undo some of the Southwest Plan deals, and I think the FDIC figured that they could kill two birds with one stone, slow down your litigation and satisfy Congress that they're trying to do something to undo one of the deals.
Deposition testimony of Wayne G. Frena on Sept. 20, 1993, at 154–55.

anyway," the Court concludes it is no basis for rescinding the Bluebonnet transaction now, nearly seven years later. A deal is a deal.

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motions for Summary Judgment are GRANTED as to the FDIC's counterclaim.

SO ORDERED.