Patrick A. WALDEN, Charles Ackerman, John Averett, Sam Baughman, Robert Butler, Ralph Cannady, Mike Clendennen, Milton Cowden, William Delong, Leslie Flynne, Linda Hewlett, James Hurst, Donald Imrie, Geoffrey Johnston, Larry Kershner, Jerry Killingsworth, Myra Mayer, Don Rice, Linnea Rose, James Shield, and Jere Shopf, Appellants and Cross–Appellees,

v.

AFFILIATED COMPUTER SERVICES, INC. f/k/a Affiliated Computer Systems, Inc., Appellee and Cross–Appellant.

No. 14–99–00075–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 16, 2003.

---

John O'Quinn, Kyle Longhofer, Randy J. McClanahan, Helen Cassidy, Houston, for appellants.

David E. Keltner, Fort Worth, Ladawn Horn Conway, W. Alan Wright, Dallas, for appellees.

Panel consists of Justices YATES, EDELMAN, and WITTIG.*

## MAJORITY OPINION ON MOTIONS FOR REHEARING

LESLIE BROCK YATES, Justice.

We grant in part appellants/cross-appellees' motion for rehearing and overrule appellee/cross-appellant's motion for rehearing. We withdraw our opinion and judgment of August 29, 2002, and substitute the following in their place.

This case involves a dispute between a data-processing company and twenty-one individuals holding stock options in that company. When the option holders attempted to exercise those options, the company refused to issue the stock. The option holders sued for breach of contract, fraud, and negligent misrepresentation. The trial court entered judgment for the option holders, awarding them an aggregate amount of $14,138,588 plus interest and attorneys' fees. Both parties appealed. We conclude the trial court erred in holding as a matter of law that an amendment to the stock option plan, signed by twenty of the twenty-one option holders, was void for lack of consideration. In addition, one option holder's options expired as a matter of law before they were exercised. We reverse the trial court's judgment in favor of the option holders who signed the amendment and remand for further proceedings consistent with this opinion. As for the remaining option holder, we affirm the court's judgment regarding liability,

---

* Senior Justice Don Wittig sitting by assignment.

but we reverse and remand for a recalculation of his damages.

### Factual and Procedural Background

Affiliated Computer Services, Inc., formerly known as Affiliated Computer Systems, Inc. ("ACS"), was formed in July 1988 through the efforts of two jointly managed savings-and-loan associations, Gibraltar Savings Association ("Old Gibraltar") and First Texas Savings Association ("First Texas"), together with a group of investors led by Darwin Deason. The savings associations provided data-processing facilities, computer equipment, software, and personnel to ACS, while the Deason group provided cash. In exchange, the savings associations and the Deason group received the bulk of ACS's stock. ACS ultimately entered into a ten-year data-processing agreement with Old Gibraltar and First Texas.

ACS also agreed to grant stock options to senior managers and key employees at Old Gibraltar and First Texas. Accordingly, ACS adopted a Non–Qualified Stock Option Plan (the "Original Plan"), and the ACS board of directors appointed a special committee to prepare a list of Old Gibraltar and First Texas officers and employees to receive stock options. All twenty-one appellants (collectively, the "option holders") were included on this list. In November 1988, ACS delivered to each option holder a Non–Qualified Stock Option Agreement (the "Original Agreement"), along with a copy of the Original Plan. Each option holder executed the Original Agreement and returned it to ACS.

On December 27, 1988, Old Gibraltar and First Texas were declared insolvent and the Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed as receiver. The same day, FSLIC organized a new bank, First Texas Bank, F.S.B., which later became known as First Gibraltar Bank, F.S.B. ("First Gibraltar"). Many of the assets formerly owned by Old Gibraltar and First Texas were transferred to First Gibraltar.

On December 28, 1988, ACS's board of directors amended ACS's stock option plan, retroactive to November 1988. By letters dated January 20, 1989, ACS sent each option holder an amendment to the Original Agreement (the "Amendment"), attaching a copy of the Amended and Restated Non–Qualified Stock Option Plan (the "Amended Plan").[1] All the option holders except one, Robert Butler, signed the Amendment.

First Gibraltar later sued ACS, seeking to repudiate the data-processing agreement. FSLIC intervened, and the lawsuit eventually settled. As part of the settlement, on August 30, 1991, the Office of Thrift Supervision ("OTS") issued a Cease and Desist Order relating to the issuance of ACS stock to former employees of Old Gibraltar and First Texas. Among other things, this order provided: "[ACS] shall henceforth not issue any stock or make any payments to ... former employees of [Old] Gibraltar/First Texas who received such options, rights, contracts or interests from or at the direction of [Old] Gibraltar/First Texas and who might seek to exercise any such options, rights, contracts or other interests, unless required to do so by a court order." The Cease and Desist Order remained in effect until it was terminated by an OTS order signed September 26, 1997.

In 1993, Patrick Walden attempted to exercise his ACS options. ACS rejected

---

**1.** Among other things, the Amended Plan altered the vesting provision in the Original Plan to provide for vesting of options upon a

"Change of Control" of ACS, rather than Old Gibraltar.

this attempt. On May 22, 1996, Walden filed suit against ACS in the 127th District Court. Walden alleged breach of his amended agreement with ACS (the "Amended Agreement"), fraud, and negligent misrepresentation. In the alternative, Walden sought a declaration that the Amendment failed for lack of consideration or fraud and alleged breach of the Original Agreement. Both parties moved for summary judgment. On November 15, 1996, the trial court denied both parties' motions, except it granted Walden's motion for summary judgment on ACS's affirmative defense that Walden's claims were barred for alleged failure to exercise his options in accordance with the Amended Agreement.

While Walden's lawsuit was proceeding, a group of twelve other option holders filed suit against ACS in the 113th District Court, alleging fraud, negligent misrepresentation, and breach of the Original Agreements.[2] The lawsuits were eventually consolidated, and additional option holders were added as plaintiffs.[3] The option holders' lawsuit ultimately consisted of the following claims against ACS:

- fraud;
- negligent misrepresentation;[4]
- breach of the Original Agreements; and
- breach of the Amended Agreements.[5]

The option holders (except Robert Butler) also sought a declaratory judgment that the Amendments failed for want of consideration or, in the alternative, did not re-

lease the option holders' status as fully vested in their options.

The parties each filed motions for summary judgment. On September 22, 1998, the trial court signed a Partial Summary Judgment Order that had the following effect:

(1) it declared all option holders became 100% vested in their options to purchase ACS stock on December 26, 1988, subject to the affirmative defenses of mutual mistake, frustration of purpose, failure of consideration, and illegality, which remained to be decided;

(2) it set aside and rescinded the Amendments for lack of consideration;

(3) it ordered that the option holders take nothing on their negligent misrepresentation claims; and

(4) it stated the option holders' fraud claims were rendered moot by virtue of the court's ruling that the Amendments were not supported by consideration.

The order further stated all other issues raised in the summary judgment motions had been taken under advisement.

The same day, the trial court conducted voir dire of the jury panel. The court also continued to hear argument and allowed the parties to supplement their summary judgment evidence on other pending issues. On its docket sheet, the court described this proceeding as a "hearing to

---

**2.** One of the option holders in the 113th District Court also brought a claim for breach of the Amended Agreement.

**3.** Subsequent pleadings also named as defendants Darwin Deason; Charles M. Young, ACS's president; and ACS Government Services, Inc. Young was later nonsuited, and neither Deason nor ACS Government Services is a party to this appeal.

**4.** Robert Butler, who never signed the Amendment, did not assert a claim for fraud or negligent misrepresentation.

**5.** Only nine of the option holders asserted claims for breach of the Amended Agreements.

narrow issues per Rule 166." The next morning, September 23, 1998, the trial court faxed each party a letter announcing its rulings on several issues. The parties then entered into a stipulation regarding the amount of attorneys' fees. Believing no fact issues remained to be decided, the trial court excused the jury panel.

On November 5, 1998, the trial court again met with the attorneys "to conclude all remaining legal issues." The trial court signed two orders reflecting its September 23 rulings. First, the court signed a "Partial Summary Judgment Order Ruling on Defendant's Motion for Summary Judgment," in which the trial court denied ACS's motion for summary judgment on the following grounds: (1) the options were void *ab initio;* (2) the Original Plan as construed by the trial court was unenforceable as illegal or against public policy; and (3) the options expired or were untimely exercised. Second, the court signed an "Order on Rule 166 and Rule 166a Hearing," in which the court:

(1) granted the option holders' no-evidence motion for summary judgment and held there were no contested material facts supporting ACS's defenses of failure of consideration, frustration of purpose, and waiver;

(2) held there was no defense of mutual mistake as a matter of law;

(3) denied all summary judgment motions not otherwise ruled upon in this or any prior orders;

(4) ruled damages were to be calculated based on the value of ACS stock as of the time of trial; and

(5) held no contested material issues remained for ACS to present evidence in opposition to the option holders'

claims for breach of the option agreements and the only issue that remained for a jury to decide was the amount of the option holders' attorneys' fees.[6]

At the November 5 conference, ACS's counsel indicated ACS believed a jury question remained as to the proper measure of damages. Accordingly, the trial court continued the pretrial conference and held a hearing on November 30, 1998. At this hearing, the option holders offered numerous exhibits and the testimony of Marc Schwartz, a certified public accountant, on the issue of the option holders' damages. The trial court stated it was accepting this evidence only for the purpose of determining whether any fact issues remained and how the court should decide legal issues "and not for the purpose of fact finding." The parties subsequently filed a stipulation regarding the fair market value of one share of ACS common stock on various dates.

On December 16, 1998, the trial court signed a final judgment. The judgment awarded damages to each option holder, calculated as "the difference between the value of the stock at the time of trial, September 22, 1998, less the exercise price of the options, times the number of shares." The judgment further awarded each option holder attorneys' fees, prejudgment interest from September 23, 1998, at ten percent per year, and postjudgment interest.

Both parties filed notices of appeal. ACS contends the trial court erred by (1) granting the option holders' motion for summary judgment and denying ACS's motion, (2) disposing of numerous disputed issues, claims, and defenses in a pretrial conference under authority of Texas Rule

---

**6.** As noted above, however, the parties entered into a stipulation regarding attorneys' fees.

of Civil Procedure 166, (3) entering a final judgment in favor of the option holders contrary to the evidence and the law, (4) measuring the option holders' damages by using the date of trial rather than the date of breach, and (5) improperly calculating prejudgment interest. The option holders argue (1) the trial court improperly calculated their damages by using the date of trial to determine the value of the ACS stock and (2) the trial court erred in holding that ACS's obligations under the option agreements were subject to the Cease and Desist Order.

### Validity of the Amendments

■■ We begin by addressing ACS's claim that the trial court erred by granting a partial summary judgment on the grounds that the Amendments should be rescinded and voided for lack of consideration.[7] ACS contends (1) no new consideration was necessary for the Amendments because the Original Agreements expressly gave ACS the right to modify the Original Plan and (2) even if consideration was required, ACS raised issues of fact as to whether the Amendments were supported by consideration. As the summary judgment movants, the option holders have the burden to show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. *See Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

With one exception, each of the option holders executed the Amendment. This Amendment purported to amend the Original Agreement so all references to the "Plan" would refer to the Amended Plan, rather than the Original Plan. The option

holders argued, and the trial court agreed, the Amendments were not supported by consideration and, therefore, were void as a matter of law.

ACS first contends the trial court erred because ACS was entitled to amend the plan without additional consideration. ACS claims the Original Agreement, which was undeniably supported by consideration, gave ACS a contractual right to modify the Original Plan. Paragraph 7 of the Original Plan provides:

> *Amendments.* The Board may, from time to time, alter, amend, suspend, or discontinue the Plan. However, no such action of the Board shall alter any outstanding Option Agreement to the detriment of the Option holder without his consent.

According to ACS, no additional consideration was needed to exercise this right, and thus the Amendments cannot be void for lack of consideration. We disagree.

■■ Texas courts have consistently adhered to the rule that a modification to a contract must itself be supported by consideration to be valid. *See Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228 (Tex.1986); *American Nat. Ins. Co. v. Teague*, 237 S.W. 248, 250 (Tex.Com.App. 1922, holding approved); *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 113 (Tex. App.-El Paso 1997, pet. denied); *Hovas v. O'Brien*, 654 S.W.2d 801, 803 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.). The lone case cited by ACS, *Wiman v. Tomaszewicz*, 877 S.W.2d 1 (Tex.App.-Dallas 1994, no writ), does not support ACS's position. In *Wiman*, the court addressed

---

**7.** The option holders argue, in the alternative, the Amendments are void because they were not adopted in conformity with ACS's bylaws. This argument was not presented as a ground for summary judgment in the option holders' motion, but rather it appears for the

first time in a "supplemental reply" filed by the option holders. Therefore, we cannot consider this argument on appeal. *See Guest v. Cochran*, 993 S.W.2d 397, 402–03 (Tex. App.-Houston [14th Dist.] 1999, no pet.).

the question of whether a material modification to a note acts as a bar to a claim against a person who had guaranteed the note. The court held this affirmative defense did not apply when the guaranty agreement expressly permitted the note to be modified. *Id.* at 7. Nothing in *Wiman* suggests the language in the guaranty agreement permitted the underlying note to be modified without additional consideration. We conclude consideration was necessary to make the Amendments enforceable.

■ We next consider whether the trial court erred in concluding as a matter of law the Amendments were void for lack of consideration. Consideration may consist of a benefit that accrues to one party or, alternatively, a detriment incurred by the other party. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991); *Lassiter v. Boxwell Bros.*, 362 S.W.2d 884, 886 (Tex.Civ.App.-Amarillo 1962, no writ). ACS contends the Amended Plan provided a benefit to the option holders in four ways:

(1) it expanded the option holders' ability to become vested in their options;

(2) it permitted option holders who left their employment to become vested sooner and to exercise their options sooner;

(3) it removed the annual escalation in option price; and

(4) it decreased the likelihood that the plan would come under attack from federal regulators.

The option holders contend the first purported benefit is illusory because the option holders were each fully vested in their options before the Amendments were executed on January 20, 1989. The trial court held as a matter of law that, under the Original Plan, all issued options, whether or not earned, became fully vested in December 1988. Under this construction of the Original Plan, any change to the option holders' ability to vest in their options would not benefit the option holders. However, ACS challenges the trial court's construction of the vesting provision. To determine whether a change in the option holders' vesting rights may constitute valid consideration for the Amendments, we must look to the language of the Original Plan.

Paragraph 2(f) of the Original Plan, titled "Vesting of Options Upon Reorganization," states:

> [I]f [Old] Gibraltar undergoes a Change of Control, then all of the Option holder's outstanding Options, whether or not earned, shall become vested, effective the day immediately prior to such … Change of Control. For purposes of the preceding sentence, a "Change of Control" shall have occurred if [Old] Gibraltar or its parent corporation is merged, consolidated, or reorganized into or with another corporation or other person or if a majority of the outstanding capital stock or all or substantially all of the assets of [Old] Gibraltar are sold to any other person. . . .

ACS claims there was no "Change of Control" because (1) Old Gibraltar's assets were not "sold" to anyone and (2) neither Old Gibraltar nor its parent company were "consolidated" or "reorganized."

ACS first contends there was no "Change of Control" because there was no sale of "all or substantially all of the assets of [Old] Gibraltar" to another person. The same day FSLIC was appointed as receiver for Old Gibraltar, FSLIC (in its capacity as receiver) executed an Acquisition Agreement with First Gibraltar. Under the Acquisition Agreement, with certain specified exceptions, First Gibraltar agreed to purchase "all of [FSLIC]'s right, title, and interest in and to all of

[Old Gibraltar]'s assets that [FSLIC] owns or holds and any of [Old Gibraltar]'s assets hereafter acquired by [FSLIC]." The following day, FSLIC (as receiver for Old Gibraltar) executed a Receiver's Agreement with FSLIC (in its corporate capacity), whereby Old Gibraltar's remaining assets were either purchased by the corporate entity or liquidated, with the proceeds going to FSLIC, the corporation.

■ Despite these agreements, ACS argues that no "Change of Control" occurred because at the time these assets were sold, they were no longer "the assets of [Old] Gibraltar." According to ACS, upon receivership, FSLIC succeeded to Old Gibraltar's assets by operation of law; therefore, the Acquisition Agreement and the Receiver's Agreement both involved transfers of *receivership* assets, not "the assets of [Old] Gibraltar" as required under the Original Plan. However, a plain reading of paragraph 2(f) does not support ACS's position. Nothing in the language of this provision requires the assets must still be in the possession of Old Gibraltar at the precise moment they are sold. Old Gibraltar's assets were undeniably sold to a third party, and the fact they might have been characterized as "former assets" at the moment of the sale is irrelevant.

■ ACS next argues Old Gibraltar's assets were not "sold" because neither First Gibraltar nor FSLIC paid anything for them. The Acquisition Agreement, however, expressly provided that First Gibraltar would assume Old Gibraltar's liabilities and that those liabilities exceeded

the value of the assets being purchased. A sale, in its broadest sense, includes any transfer of property from one person to another for a valuable consideration. *McKinney v. City of Abilene,* 250 S.W.2d 924, 925 (Tex.Civ.App.-Eastland 1952, writ ref'd n.r.e.). The assumption of liabilities is valid consideration for a sale of assets. *See Shaw v. Warren,* 68 S.W.2d 588, 590 (Tex.Civ.App.-Eastland 1933, no writ). We conclude substantially all of Old Gibraltar's assets were sold to First Gibraltar and FSLIC.

Finally, ACS claims other courts construing similar change-of-control provisions have held a transfer of assets following insolvency and receivership of a bank does not constitute a "sale" as a matter of law. In each of these cases, however, the court's conclusion was based on the specific language in the change-of-control provision. For example, in *McCarron v. FDIC,* 111 F.3d 1089 (3d Cir.1997), the agreement specifically required the approval of the bank's board of directors before a "change of control" could trigger an executive's right to severance pay. Because it would be impossible to obtain such approval after the bank was closed by regulators, the court concluded that involuntary transfers were not contemplated by the agreement. *Id.* at 1095. In *Hibyan v. FDIC,* 812 F.Supp. 271 (D.Me.1993),[8] the court held the change-of-control provision clearly excluded involuntary transfers because it required affirmative action on the part of the bank to sell, exchange or transfer its assets. *Id.* at 274.[9] In this case, the defini-

---

8. A third case cited by ACS, *Winters v. FDIC,* 812 F.Supp. 1 (D.Me.1992), involved the same contract language (and the same insolvent bank) as in *Hibyan. See Hibyan,* 812 F.Supp. at 274.

9. The *Hibyan* court's conclusion was based on the use of the active voice in the change-of-control provision: "The contract language

plainly states that a change of control event occurs if 'The *Company or the Bank shall ... sell, exchange or transfer* all or substantially all of its assets to some other person ....'" 812 F.Supp. at 274 (emphasis in original). In contrast, the change-of-control provision in this case uses the passive voice: "[A] 'Change of Control' shall have occurred if ... *all or*

tion of "Change of Control" focuses on the act of selling the assets, not on who sells them.

Accordingly, we conclude a "Change of Control" was triggered under the Original Plan because "substantially all of the assets of [Old] Gibraltar" were "sold." We express no opinion as to whether Old Gibraltar was "consolidated" or "reorganized" with another entity.

 ACS advances several reasons why it believes the trial court's construction of the Original Plan's vesting provision is unreasonable. ACS argues allowing the options to vest upon the forced sale of Old Gibraltar's assets in receivership (1) would be contrary to the provision's intended purpose of encouraging employees to promote and maintain the relationship with ACS, (2) would be inconsistent with the parties' belief at the time the options were granted that Old Gibraltar would not be placed into receivership, and (3) would result in an illegal contract. ACS's first two arguments amount to nothing more than an attempt to introduce parol evidence of the "true" intent behind the vesting provision. Because we conclude that the language in this provision is unambiguous, this parol evidence is inadmissible. *See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995) (per curiam).

ACS's third argument is that if the options vested immediately upon the failure of Old Gibraltar, the Original Plan would (1) violate federal regulations against ex-

cessive compensation, (2) constitute an "unsafe and unsound practice" in the operation of a savings-and-loan association, and (3) violate public policy. We disagree.

 Whether a contract is legally enforceable is a question of law. *See McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 733 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd). ACS contends, based on the trial court's construction of the vesting provision, the Original Plan constitutes an "unsafe and unsound" practice in violation of Title IV of the National Housing Act, 12 U.S.C. §§ 1724–1730i (repealed 1989).[10] ACS also alleges the Original Plan, as construed by the trial court, violates a federal regulation against excessive compensation. *See* 12 C.F.R. § 563.161(b) (2001).[11] That regulation provides as follows:

> Compensation to officers, directors, and employees of each savings association and its service corporations shall not be in excess of that which is reasonable and commensurate with their duties and responsibilities.

*Id.* The crux of ACS's argument is that, by allowing the options to vest immediately after Old Gibraltar was placed into receivership, the Original Plan provided the option holders with excessive compensation resulting from the failure of Old Gibraltar. Here, however, the stock options came not from Old Gibraltar, but from ACS. Under the current federal statute governing the operation of savings associations, courts have held an institution's practices are not

---

*substantially all of the assets of [Old] Gibraltar are sold* to any other person . . . ."

**10.** Title IV of the National Housing Act was repealed when FSLIC was abolished in 1989; however, any rights, duties, or obligations that arose under Title IV and existed before August 9, 1989, were unaffected by the abolishment of FSLIC. *See* Pub.L. No. 101–73, § 401(f)(1), 103 Stat. 183, 356 (1989).

**11.** The only other regulation ACS cites is one relating to employment contracts between a savings association and its employees. *See* 12 C.F.R. § 563.39 (2001). ACS fails to demonstrate how this regulation applies to ACS's issuance of options to employees of Old Gibraltar and First Texas.

unsafe and unsound unless they "pose an abnormal risk to the financial stability of the banking institution." *In re Seidman,* 37 F.3d 911, 928 (3d Cir.1994). This is not a case where a savings association's employees received compensation directly from their employer that was triggered solely by the failure of the savings association. ACS issued the options and decided they would immediately vest upon a sale of Old Gibraltar's assets, whether voluntary or involuntary, and without regard to when such a sale might occur. Nothing about this vesting provision posed a risk to Old Gibraltar's financial stability. The fact that the sale occurred, apparently unexpectedly, within two months after the options were issued does not alter this conclusion.

■ ACS also claims the trial court's construction of the Original Plan violates public policy by creating an incentive for the option holders to make Old Gibraltar fail, thereby becoming vested in their options. Under the Original Plan, even if the option holders were fully vested, they could not exercise their options until five years after the options were issued. Presumably, the value of those options depended on the success of ACS. At the time the options were issued, ACS's only customers were Old Gibraltar and First Texas. It defies logic to suggest the option holders would have had an incentive to make Old Gibraltar fail just so their options would vest, at the risk of making those options (which could not be exercised for five years) considerably less valuable.

■ We conclude, under the unambiguous language of the Original Plan, a "Change of Control" occurred no later than December 28, 1988, the date of the Receiver's Agreement. Thus, under the Original Plan, all options issued to the option holders became vested no later than December 27, 1988. Having reached this conclusion, we agree with the option holders that any alleged expansion of their ability to become vested in their options would provide no additional benefit and cannot be consideration for the Amendments.

ACS next argues the Amended Plan provided a benefit to the option holders by allowing them to exercise their options sooner than they could have under the Original Plan. Under the Original Plan, the option holders could not exercise any options, whether or not vested, until five years after the options were granted. The Amended Plan added a provision whereby, in certain circumstances, the option holders could exercise some of their options sooner.[12] The option holders contend that this purported benefit is illusory because it is offset by (1) the loss of vested rights in some of their options and (2) a limit on the period of time during which the options could be exercised.

■ We conclude the Amended Plan provided the option holders some benefit by giving them an opportunity to exercise some of their options without having to wait until five years after the options were issued. The option holders' own expert testified the ability to obtain ACS stock before five years had passed might be a benefit to someone leaving his or her employment. We recognize the value of this benefit is diminished by (1) the fact that an

12. Under the Amended Plan, each option holder "earned" twenty percent of his or her options each year for five years from the date the options were granted. Upon the termination of an option holder's employment (other than for cause) with Old Gibraltar, First Texas, or a successor in interest, the option holder would become vested in all options that had been earned to that time. The option holder could then exercise those options for a period of sixty days from the date of termination.

option holder could not exercise his or her options early without losing vested rights (provided under the Original Plan) to some of those options and (2) the sixty-day limitation on exercising those options. Nevertheless, we cannot say the option holders have conclusively established, as a matter of law, ACS provided *no* consideration to support the Amendments. Accordingly, summary judgment was not appropriate. *See Roark,* 813 S.W.2d at 496 (reversing a summary judgment based on lack of consideration because the movant failed to prove conclusively that no consideration supported the alleged contract).

 ACS argues it also gave consideration for the Amendments by eliminating the annual escalation in option price in the Amended Plan. Under the Original Plan, the price of the options would increase by seven percent each year. However, this provision was changed by an amendment to the Original Plan that was adopted and incorporated into the Original Plan when the Original Agreements were executed. Thus, the elimination of the yearly seven-percent increase in the option price was already reflected in the Original Plan. A promise to fulfill a pre-existing obligation cannot serve as new consideration. *See Barnes v. Forest Hills Inv., Inc.,* 11 F.Supp.2d 699, 707 (E.D.Tex.1998); RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981).

 Finally, ACS claims the Amended Plan reduced the likelihood that the granting of options to employees of Old Gibraltar and First Texas would be construed as unlawful. As we note above, the vesting provision of the Original Plan, as construed by the trial court, does not run afoul of any laws or regulations. Accordingly, any alleged reduction of risk does not constitute consideration.

In summary, we conclude the option holders failed to establish as a matter of law that the Amendments were void for lack of consideration. Specifically, the option holders did not conclusively show the change in the procedure for exercising options upon termination of employment conferred no benefit on the option holders. The trial court's judgment in favor of the option holders was based on the option holders' claim that the Original Agreements governed the parties' relationship. We therefore reverse the judgment with respect to all option holders except Robert Butler and remand for further proceedings.

## The Trial Court's Legal Rulings

Next, ACS contends the trial court erred in disposing of various claims and defenses as a matter of law. ACS asserts it raised fact issues precluding summary judgment on its affirmative defenses of failure of consideration, frustration of purpose, and waiver. ACS also complains the trial court improperly disposed of other affirmative defenses and found breach as a matter of law at a pretrial conference under the purported authority of Texas Rule of Civil Procedure 166. Finally, ACS claims it established as a matter of law that the option holders' options expired while they were legally unexercisable.

### *Summary Judgment Rulings*

The option holders moved for summary judgment on the following defenses: (1) statute of limitations, (2) failure of consideration, (3) waiver, (4) frustration of purpose, and (5) legal impossibility and/or superseding federal regulatory order. In its partial summary judgment order, the trial court concluded, based on its interpretation of the unambiguous language in the "Change of Control" provision of the Original Plan, the option holders became fully vested in their options, subject to the affirmative defenses of (1) mutual mistake, (2)

frustration of purpose, (3) failure of consideration, and (4) illegality. The trial court's order further stated these four affirmative defenses remained to be decided. The court's order concluded with the statement that "[a]ll other issues raised in the Parties' summary judgment motions have been taken under advisement."

On November 5, 1998, the trial court issued both a "Partial Summary Judgment Order Ruling on Defendant's Motion for Summary Judgment" and an "Order on Rule 166 and Rule 166a Hearing." These two orders had the following combined effect regarding ACS's affirmative defenses:

(1) the court denied ACS's motion for summary judgment on the grounds that the options were (a) void *ab initio* and (b) unenforceable for being illegal or against public policy, finding ACS's motions to be without merit;

(2) the court denied ACS's motion for summary judgment on the grounds that the options expired or were untimely exercised, based on the court's finding that, as a matter of law, the options did not expire until October 3, 1997;

(3) the court granted the option holders' motion for summary judgment on ACS's defenses of complete and partial failure of consideration, finding no contested material facts to support submission of these defenses to the jury;

(4) the court granted the option holders' motion for summary judgment on ACS's defense of frustration of purpose, ruling that (a) no such legal defense exists as a matter of law and (b) even if it were to be adopted in Texas, it is not available to ACS as a matter of law;

(5) the court granted the option holders' motion for summary judgment on the defense of waiver, finding no contested material facts to support submission of the defense to the jury; and

(6) the court found no defense of mutual mistake as a matter of law, based on the court's previous finding that the vesting provision in the Original Plan was unambiguous.

ACS begins by attacking the trial court's order granting summary judgment to the option holders on ACS's defenses of failure of consideration, frustration of purpose, and waiver. The option holders moved for summary judgment on the ground there was no evidence to support these defenses. *See* TEX.R. CIV. P. 166a(i). In reviewing a no-evidence summary judgment, we look at the evidence in the light most favorable to the nonmovant and disregard all evidence and inferences to the contrary. *Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 432 (Tex.App.-Houston [14th Dist.] 1999, no pet.). A no-evidence summary judgment is improperly granted if the nonmovant counters with more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.*

ACS first argues the trial court erred in granting summary judgment on ACS's affirmative defense of failure of consideration. Generally, failure of consideration occurs when, because of some supervening cause after an agreement is reached, the promised performance fails. *Stewart v. United States Leasing Corp.*, 702 S.W.2d 288, 290 (Tex. App.-Houston [1st Dist.] 1985, no writ). A complete failure of consideration constitutes a defense to an action for breach of contract. *Gensco, Inc. v. Transformaciones Metalurgicias Especiales, S.A.*, 666 S.W.2d 549, 553 (Tex.App.-Houston [14th

Dist.] 1984, writ dism'd). Here, ACS contends the consideration for both the Original Agreements and the Amended Agreements failed because the data-processing agreement between ACS and Old Gibraltar/First Texas was repudiated by FSLIC. In support of its claim that the data-processing agreement constituted consideration for its agreements with the option holders, ACS relies on a provision in the Original Plan (which also appears in the Amended Plan) whereby, "[i]n further consideration" for the data-processing agreement, Old Gibraltar's board of directors was given the right to designate a list of individuals to receive options.[13] Even assuming the data-processing agreement constitutes consideration for the right given to Old Gibraltar's board to designate option recipients, it does not follow that the data-processing agreement was also consideration for the individual agreements between ACS and the option holders. ACS failed to present more than a scintilla of evidence to support its failure-of-consideration defense. Accordingly, the trial court did not err in granting summary judgment on this affirmative defense.

 ACS next claims the trial court erred in granting summary judgment on ACS's frustration-of-purpose defense. However, ACS fails to cite to a single Texas case applying frustration of purpose as an affirmative defense to a claim for breach of contract. Nor does ACS present any argument or authorities explaining why this defense should be adopted. The trial court properly granted summary judgment on this purported defense.

 Next, ACS asserts it raised fact issues precluding summary judgment on the defense of waiver. Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971). Waiver can be established either by a party's express renunciation of a known right or by silence or inaction for so long a period as to show an intention to yield the known right. *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex.1996). ACS contends the summary judgment evidence shows that many of the option holders were aware that the Amendment would eliminate their vested rights and renounced those rights by signing the Amendment. ACS first points to admissions from nine of the option holders that they received and had an opportunity to review the Amended Plan before they signed the Amendment. We cannot say these admissions constitute more than a scintilla of evidence that any of these option holders (1) knew all their options had already vested and (2) signed the Amendment with the intent of relinquishing their vested rights.

 ACS also cites deposition testimony from two option holders, James Shield and Linnea Rose. Rose testified she recognized the Amendment would alter the "Change of Control" provision in the Original Plan, but she did not understand what effect this change would have on her own options. We find this evidence insufficient to raise a fact issue with respect to ACS's waiver defense. Shield, however, testified that at the time he signed the Amendment, he believed his options may have already been vested and the Amendment might

---

**13.** ACS also points to a short excerpt from the deposition of Kenneth Biederman, whom ACS does not otherwise identify. We find nothing in the cited excerpt supporting ACS's position that the existence of the data-processing agreement was consideration for either the Original or Amended Agreements.

change that. We conclude ACS has provided more than a scintilla of summary judgment evidence to support its claim that by signing the Amendment, Shield intended to relinquish known rights. Accordingly, with respect to ACS's affirmative defense of waiver, we reverse only that portion of the summary judgment in favor of James Shield.

■■■■ ACS also argues that by insisting on performance, the option holders waived any prior breaches or repudiations of the Original Agreement. Although this court has stated a party to a contract may effectively waive a breach by the other party by continuing to insist on performance, waiver in such cases is found only when the previously breaching party subsequently performs. *See, e.g., Delgado v. Methodist Hosp.,* 936 S.W.2d 479, 485 (Tex.App.-Houston [14th Dist.] 1996, no writ) (holding that a patient who alleged a hospital breached an agreement by denying her a private room waived her contract claim by insisting on and accepting a private room). Here, ACS refused to issue stock in response to the option holders' attempt to exercise their options in September 1998. Thus, as a matter of law, the option holders did not waive their breach-of-contract claims. *See Consolidated Eng'g Co. v. Southern Steel Co.,* 699 S.W.2d 188, 191 (Tex.1985) (stating that a jury finding that the non-breaching party continued to insist on performance after the breach occurred does not establish waiver).

In summary, we conclude ACS raised an issue of fact as to whether James Shield intentionally relinquished his rights under the Original Agreement by signing the Amendment. Thus, we reverse the summary judgment granted in favor of Shield on ACS's affirmative defense of waiver. We find no error in the trial court's other summary judgment rulings challenged by ACS.

### Pretrial Conference Rulings

■■■■ Next, ACS complains the trial court exceeded its authority under Rule 166 by disposing of disputed issues in a pretrial conference. The purpose of Rule 166 is "to assist in the disposition of the case without undue expense or burden to the parties." TEX.R. CIV. P. 166. Before 1990, Rule 166 did not expressly authorize the trial court to determine the merits of an issue, absent either admissions by a party or an agreement of counsel. *See, e.g., Mason v. Tobin,* 408 S.W.2d 243, 245 (Tex.Civ.App.-Houston 1966, no writ). However, a 1990 amendment, among other things, added subsection (g), expressly allowing the trial court to use the pretrial conference to consider "[t]he identification of legal matters to be ruled on or decided by the court." TEX.R. CIV. P. 166; *see also id.* ("The court shall make an order . . . which limits the issues for trial to those not disposed of by admissions, agreements of counsel, *or rulings of the court* . . . .") (emphasis added). Of course, the trial court's authority in a pretrial conference is limited to deciding legal, not factual, issues. Issues that are ordinarily fact questions become questions of law when reasonable minds cannot differ on the outcome. *See, e.g., Logan v. Mullis,* 686 S.W.2d 605, 608 (Tex.1985); *Robertson County v. Wymola,* 17 S.W.3d 334, 342 n. 12 (Tex.App.-Austin 2000, pet. denied). Thus, with respect to those issues properly categorized as legal, the trial court did not err procedurally in disposing of them by a pretrial order issued under Rule 166.

■■■■ ACS contends the trial court's purported pretrial conference was actually a trial on the merits, exceeding the trial court's authority and depriving ACS of due

process and its right to a jury trial. The constitutional right to trial by jury ultimately depends on the existence of a material issue of fact. *In re Higganbotham's Estate*, 192 S.W.2d 285, 289 (Tex.Civ.App.-Beaumont 1946, no writ). Just as the proper granting of a summary judgment or directed verdict does not offend the constitution, neither does the use of Rule 166 to dispose of legal issues. *See Wyche v. Works*, 373 S.W.2d 558, 561 (Tex.Civ. App.-Dallas 1963, writ ref'd n.r.e.) (summary judgment); *Henry v. Thomas*, 74 S.W. 599, 601 (Tex.Civ.App.-Dallas 1903, writ ref'd) (directed verdict).[14]

 With respect to ACS's due-process complaint, ACS provides no explanation why the trial court's actions allegedly deprived it of due process. ACS merely cites two opinions from the First Court of Appeals: *Murphree v. Ziegelmair*, 937 S.W.2d 493 (Tex.App.-Houston [1st Dist.] 1995, no writ), and *Masterson v. Cox*, 886 S.W.2d 436 (Tex.App.-Houston [1st Dist.] 1994, no writ). Both cases involved the trial court's entry of a post-answer default judgment against a defendant who failed to attend a pretrial conference. In each instance, the court held the trial court erred by disposing of the case without providing the defendant notice of a trial

setting or otherwise notifying the defendant that disposition could occur at the conference. *See Murphree*, 937 S.W.2d at 495; *Masterson*, 886 S.W.2d at 438–39. Here, in contrast to those cases, the court had already called the case to trial when the first pretrial-conference hearing took place. ACS was undeniably on notice of that trial setting and appeared at the pretrial conference.

 Although the trial court received exhibits and heard testimony from an expert witness, the court made clear it was not admitting evidence for fact-finding purposes but merely determining whether any fact issue remained for submission to a jury.[15] We do not believe Rule 166, in its present form, prevents a trial court from adopting such a procedure for the limited purpose of identifying and ruling on legal issues, provided the court's rulings do not resolve factual disputes that properly fall within the province of the jury. *Cf. Martin v. Dosohs I, Ltd.*, 2 S.W.3d 350, 355 (Tex.App.-San Antonio 1999, pet. denied) (concluding that dismissal of a case following a pretrial hearing, while not favored, is allowed in limited situations when determination of a legal question is dispositive of the case).[16]

---

14. Notably, at the November 5, 1998 hearing, in response to ACS's general objection that "there are fact issues that should be submitted to the jury," the trial court repeatedly indicated its willingness to sustain the objection and asked ACS to identify those issues that should have been submitted to a jury. With the sole exception of the proper measure of damages, for which the only factual dispute was later resolved by stipulation, ACS refused to identify a single issue.

15. Furthermore, while ACS objected to the presentation of evidence during the various hearings, it filed an extensive offer of proof with exhibits (totaling over 3000 pages) in opposition to the court's proposed rulings.

16. The trial court's approach is similar to that recognized by several federal circuits under the federal counterpart to Rule 166. *See* FED. R.CIV.P. 16. At least four courts of appeals have held *Federal* Rule 16 permits the trial court to dispose of issues summarily and without a motion when the pretrial conference discloses that no material facts are in dispute. *See Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir.1996); *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985); *Diaz v. Schwerman Trucking Co.*, 709 F.2d 1371, 1375 n. 6 (11th Cir.1983); *Wirtz v. Young Elec. Sign Co.*, 315 F.2d 326, 327 (10th Cir.1963); *but see Syracuse Broadcasting Corp. v. Newhouse*, 271 F.2d 910, 914 (2d Cir.1959) ("Rule 16 confers no special power

 To the extent ACS contends the trial court improperly disposed of claims or issues that should have gone to the jury, we review ACS's complaint by the same standard used in reviewing a directed verdict. A directed verdict is warranted when the evidence is such that no other verdict can be rendered and judgment should be granted as a matter of law. *Seymour v. American Engine & Grinding Co.*, 956 S.W.2d 49, 57 (Tex.App.-Houston [14th Dist.] 1996, writ denied). In its brief, ACS broadly states that "contested issues of material fact exist for the jury on all issues, claims and defenses improperly disposed of by the trial court under Rule 166." However, ACS specifically identified only five such issues—the option holders' claim for breach and ACS's affirmative defenses of legal impossibility, illegality, mutual mistake, and void *ab initio*. With respect to any other issue ACS contends was improperly disposed of by the trial court under Rule 166, ACS has waived its complaint on appeal. *See* TEX.R.APP. P. 38.1(h); *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 280 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

 ACS first complains the trial court erred in finding no contested material issues existed on the option holders' claim that ACS breached the Original Agreements. ACS does not dispute it failed to issue ACS stock in response to each option holder's delivery to ACS of "written notice . . . accompanied by full payment" for the shares. ACS instead relies on its various affirmative defenses to avoid liability. Accordingly, the trial court did not err in concluding as a matter of law that ACS's conduct, subject to any applicable affirmative defense, constituted a breach of the Original Agreements.

 Next, ACS alleges the trial court improperly determined its affirmative defense of legal impossibility failed as a matter of law. In response, the option holders argue the trial court erred in concluding ACS's obligations under the agreements were subject to the Cease and Desist Order. The option holders claim this ruling is contrary to OTS's interpretation of its order as expressed in a letter from Richard Stearns, OTS's Deputy Chief Counsel for Enforcement, in response to an inquiry about Patrick Walden's suit against ACS. Stearns's letter merely states the Cease and Desist Order does not prohibit Walden (or any other option holder not expressly named in that order) from seeking a court order or judgment to determine his entitlement to stock or payments.[17] This is consistent with the language in the Cease and Desist Order prohibiting ACS from issuing stock or making payments "unless required to do so by court order." Here, in the absence of any court order to the contrary, ACS was bound by the terms of

---

of dismissal not otherwise contained in the rules.").

The dissent expresses some concerns with the use of Rule 166 in this way, most notably that a party may not be apprised of the need to present its evidence at the pretrial conference and a party may not be able to create an adequate record of the evidence presented. However valid these concerns may be in the abstract, they do not apply here. The pretrial conference in this case began the same day the case was set for trial; thus, ACS clearly was on notice it should be prepared to present its evidence and all claims and defenses were subject to final disposition. As for ACS's ability to make a record, the trial court twice continued the pretrial conference and repeatedly gave ACS the opportunity to present evidence it believed raised a triable issue of fact. ACS ultimately filed an offer of proof consisting of over 3000 pages of affidavits and exhibits. Accordingly, ACS had the opportunity to and did create an adequate record for this court to review.

**17.** At the time Stearns wrote this letter, the Cease and Desist Order was still in effect.

the Cease and Desist Order. Thus, we find no error in the trial court's conclusion that ACS was subject to that order.

ACS alleges its performance under either the Original or Amended Agreements was excused by the doctrine of legal impossibility, citing *Centex Corp. v. Dalton*, 840 S.W.2d 952 (Tex.1992). In *Centex*, the Texas Supreme Court held when a governmental regulation or order makes a party's performance under an agreement impracticable, the defendant is excused from performance. *Id.* at 954. Centex had agreed to pay John Dalton a finder's fee of $750,000 in connection with Centex's acquisition of a group of banks. After the agreement was signed, however, the Federal Home Loan Bank Board adopted a regulation prohibiting the payment of any such fee. OTS later issued a cease-and-desist order to prevent Centex's payment. The court concluded Centex's performance under the agreement was made impracticable by having to comply with the Bank Board's order; therefore, Centex's duty to perform was discharged. *Id.*

■■■■■ Unlike the Bank Board's order in *Centex*, however, the Cease and Desist Order in this case had been terminated by the time of trial. Accordingly, there currently exists no legal impediment making ACS's performance impracticable. *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 328 (5th Cir.2001) ("[T]he presence of an injunction, in and of itself, does not excuse performance indefinitely.") Furthermore, although the Cease and Desist Order was in effect at the time most of the options holders exercised their options, the Original Plan expressly addresses this situation. Paragraph 2(d), which governs the manner by which options may be exercised, provides as follows:

> At the time of delivery, [ACS] shall ... deliver to the Option holder ... a certificate or certificates for such shares, *provided, however, that the time of delivery may be postponed by [ACS] for such period as may be required for it with reasonable diligence to comply with any requirements of law* .... [Emphasis added.]

Thus, even though the Cease and Desist Order prevented ACS from issuing stock, it did not prohibit ACS from performing its duties under the Original Agreements. The only allegations of impossibility center around the Cease and Desist Order and issues of contract construction. These are questions of law. *See Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). Thus, the trial court did not err in concluding ACS's legal-impossibility defense failed as a matter of law.

■■■■ ACS contends it raised fact issues on its affirmative defense of illegality. However, whether a contract is legally enforceable is a question of law. *See McCreary*, 68 S.W.3d at 733. For the reasons set forth in our discussion above concerning consideration for the Amendments, we agree with the trial court's conclusion that the Original Agreements are not illegal and do not violate public policy.

■■■■ Next, ACS claims it presented evidence that at the time the Original Plan was formed, both ACS and Old Gibraltar mistakenly believed that Old Gibraltar would not be dissolved, but instead would continue to exist under a federal program known as the Southwest Plan.[18] Thus, ACS

---

18. The Southwest Plan was a program adopted by the Federal Home Loan Bank Board in the late 1980s and designed to induce private capital investors to bail out failed savings-and-loan associations in the southwestern United States. *See generally Bluebonnet Sav. Bank v. FDIC*, 891 F.Supp. 332, 333–34 & n. 3 (N.D.Tex.1995). According to ACS, the parties believed Old Gibraltar would be a "survivor" under the Southwest

asserts it raised a contested issue of fact as to whether the Original Plan was the product of a mutual mistake, and should be rescinded. Under the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided. *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990). To prove a mutual mistake, however, the evidence must show that both parties were acting under the same misunderstanding of the same material *fact. Seymour,* 956 S.W.2d at 58. Here, the alleged "mistake" did not concern any presently existing fact, but rather a belief regarding some future occurrence. Accordingly, the trial court did not err in concluding this defense fails as a matter of law.

Finally, ACS alleges Old Gibraltar's board of directors never approved the list of option recipients. ACS contends the board's approval was a condition precedent under the Original Plan, and therefore, ACS raised a fact issue as to whether the options were void *ab initio.* Whether language in an agreement constitutes a condition precedent is a matter of contract construction, which is a question of law. *See Elliott–Williams,* 9 S.W.3d at 803; *C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 715 (Tex. App.-Dallas 1989, writ denied). ACS relies on language in the Original Plan that states "the Board of Directors of [Old] Gibraltar will have a one-time right to designate the recipients of Options to acquire ... [ACS] Common Stock." Nothing in this language suggests the approval of Old Gibraltar's board was intended to be an act "that must occur before there is a right to immediate performance and before there is a breach of contractual duty."

*Hohenberg Bros. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976); *Marsh v. Marsh,* 949 S.W.2d 734, 743–44 (Tex.App.-Houston [14th Dist.] 1997, no pet.). We conclude the board's right to designate the option recipients was not a condition precedent to the granting of options by ACS to the option holders. The trial court did not err in disposing of ACS's void-*ab-initio* affirmative defense.

Because Rule 166 expressly authorizes the trial court to rule on legal issues before trial, we find no error in the trial court's procedure for disposing of various claims and defenses as a matter of law. ACS failed to demonstrate that a genuine issue of material fact existed as to any of the matters ruled on by the trial court at the pretrial conference.

### *Failure To Exercise Options*

ACS claims judgment should be rendered in its favor because the options expired by their terms while they could not legally be exercised. Both the Original Plan and the Amended Plan provide that "each unexercised Option, whether or not vested, shall expire ... three years after an initial public offering of [ACS] Common Stock." ACS argues the options expired on September 25, 1997, and the Cease and Desist Order prevented the options from being exercised until the next day. The trial court concluded as a matter of law ACS's obligations under the option agreements were subject to the Cease and Desist Order, which was terminated on September 26, 1997. However, the trial court further ruled as a matter of law the date of the "initial public offering" of ACS stock was October 3, 1994, and therefore, the options expired by their terms on October 3, 1997.

Plan, which would result in the assets of other failed savings associations being consolidated

into Old Gibraltar.

ACS first contends the trial court erred in concluding the "initial public offering of Common Stock" occurred on October 3, 1994. We agree with ACS. Construction of a contract is a question of law. *Elliott–Williams,* 9 S.W.3d at 803. Because the phrase "initial public offering" is not specifically defined in either plan, we apply the plain, ordinary, and generally accepted meaning. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex.1999). In the securities context, an "initial public offering" is the commonly used term for the first offering of equity securities of an issuer to the public pursuant to a registration statement. *See* 69A AM.JUR.2D *Securities Regulations—State* § 101, n. 93 (1993); *see also* BLACK'S LAW DICTIONARY 1082 (6th ed.1990) (defining "public offering" as the offering of securities at random and in general to anyone who will buy, and noting that public offerings are generally regulated by federal and state laws and regulations). The Securities and Exchange Commission issued an order declaring ACS's registration statement effective at "4:30 PM EST September 26, 1994." The effective date of a registration statement is generally considered the commencement of a public offering. *See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 3 (2d Cir. 1996). This is the first date on which ACS could sell its stock to the public. We conclude the plain meaning of the term "initial public offering of Common Stock" as used in both the Original and Amended Plans refers to the effective date of ACS's registration statement—September 26, 1994.

Next, the parties dispute how to calculate the date the options expire. ACS argues "three years after" September 26, 1994, ended just before midnight on September 25, 1997. Thus, according to ACS, any action taken by the option holders on September 26, 1997, would have been too late. While we agree with ACS's method of calculating the three-year period, we disagree with its use of midnight as the cut-off. By law, ACS was not entitled to offer its common stock to the public until 4:30 p.m. on September 26, 1994. Accordingly, three years did not pass from ACS's initial public offering until the same time on September 26, 1997.

The option holders contend they had a right to a one-year extension of the exercise period under the Original Plan. However, this provision applies only if ACS first determined "in its sole discretion" that no exemption from registration of the stock to be issued is available with respect to an option holder. Furthermore, the Original Plan states if ACS declines to issue stock under this provision, the option holder is "entitled to opt" for an extension of the exercise period. The option holders presented no evidence they sought such an extension. Thus, the three-year period for exercising options was not extended.

Finally, ACS contends because the Cease and Desist Order was not terminated until September 26, 1997, the options expired before they could be legally exercised by the option holders. We disagree. Both the Original Plan and the Amended Plan provide only for the expiration of "unexercised" options. The plans further state, "Options may be exercised ... by written notice to [ACS] ... accompanied by full payment, if any, for the shares ...." While the Cease and Desist Order expressly prohibited ACS from issuing stock to the option holders, it did not prohibit the option holders from exercising their options by delivering written notice to ACS accompanied by payment. With the sole exception of Don Rice, the option holders conclusively established that each of them provided written notice to ACS of their intent to exercise their options, with

payment, before 4:30 p.m. on September 26, 1997. Because the record affirmatively shows Rice did not exercise his options before they expired, we conclude ACS is entitled to judgment as a matter of law on Rice's claim for breach of the Original Agreement. As for the remaining option holders, however, the trial court properly held the options were timely exercised.

Based on our conclusion judgment should have been entered against Rice on his breach-of-contract claim, ACS urges us to render judgment that Rice take nothing. The option holders respond that rendition is inappropriate because issues of negligent misrepresentation and fraud remain for consideration.[19] The trial court expressly granted ACS summary judgment on the option holders' negligent-misrepresentation claims, and the option holders have not assigned error to this ruling. Although ACS also moved for summary judgment on the option holders' fraud claims, the trial court held that those claims were rendered moot by the court's ruling that the Amendments were void for lack of consideration. Thus, the trial court never reached this issue. Furthermore, the parties did not brief the question of whether ACS is entitled to judgment on the option holders' fraud claims. Accordingly, we reverse Don Rice's portion of the judgment and remand it to the trial court to consider whether ACS is entitled to summary judgment on Rice's fraud claim. *See Monsanto Co. v. Boustany,* 73 S.W.3d 225, 232–33 (Tex.2002) (remanding claims to the court of appeals that were not reached by that court and were not briefed in the supreme court).

### Measure of Damages

Both parties complain on appeal the trial court erred in measuring the option holders' damages on their breach-of-contract claims. Determining the proper method for measuring damages is a question of law for the court. *See Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). When, as here, the damage components are undisputed, damages may be calculated as a matter of law. *See Taylor Pub. Co. v. Systems Marketing Inc.,* 686 S.W.2d 213, 217 (Tex.App.-Dallas 1984, writ ref'd n.r.e.). The trial court calculated damages based on the value of ACS common stock on the date of trial. The option holders argue they are entitled to recover damages based on the highest value of the stock between the date of ACS's breach and the date of trial. ACS contends damages should be determined based on the stock's value at the time of the breach. We conclude damages in this case should be calculated based on the value of ACS stock on the first day after ACS's breach on which the option holders were entitled to receive their stock.

The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *See Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). In a case involving a contract to deliver stock, the proper measure of damages for breach of that contract is the same as for other contracts: the difference between the price contracted to be paid and the value of the article at the time when it should have been delivered. *Miga v. Jensen,* 46 Tex. Sup.Ct. J. 89, 94, 2001 WL 34038821, at \*5 (Oct. 31, 2002) (citing *Randon v. Barton,* 4 Tex. 289, 293 (1849)). While this rule would normally require damages to be calculated based on the stock's value on the date of the breach, in this case each option holder was not necessarily entitled

---

**19.** Rice did not allege breach of the Amended Agreement.

to receive the stock on the date ACS breached the Original Agreement. For example, ACS breached its agreement with Robert Butler on August 26, 1997, when it rejected his exercise of the options and returned his payment. However, ACS was prohibited from issuing stock while the Cease and Desist Order was in effect. Thus, Butler would not have been entitled to receive his shares until the first business day after the Cease and Desist Order was lifted on September 26, 1997. Therefore, to compensate Butler for his actual losses resulting from ACS's breach of the Original Agreement, Butler's damages should be calculated based on the value of ACS stock on September 29, 1997, the first date after ACS's breach on which he actually could have taken delivery of the stock. The parties stipulated the fair market value of one share of ACS common stock on September 29, 1997, was $25.375. Thus, Robert Butler's damages for breach of the Original Agreement should be calculated based on this value, less the exercise price of his options, times the number of shares.

### Prejudgment Interest

Finally, ACS complains the trial court erred in awarding the option holders prejudgment interest at a rate of ten percent per year. ACS argues the court should have awarded prejudgment interest at the rate of six percent per year pursuant to section 302.002 of the Texas Finance Code. We hold that this statute does not apply to an award of prejudgment interest.

■ Until 1997, article 5069–1.03 of the Texas Revised Civil Statutes provided for prejudgment interest at the rate of six percent per year on a breach-of-contract claim involving a contract in which the amount payable could be ascertained with reasonable certainty. *See Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 950 S.W.2d 371, 373–74 (Tex.1997).[20] In 1997, the Texas Legislature repealed article 5069–1.03 when it enacted the Texas Credit Title. *See* Act of June 2, 1997, 75th Leg., R.S., ch. 1396, §§ 1, 48, 1997 Tex. Gen. Laws 5202, 5203, 5250 (repealing, among others, articles 5069–1.01 to –1.14 and 5069–1A.01 of the Texas Revised Civil Statutes and enacting articles 5069–1B.001 to –1H.103). In a separate act in the same legislative session, however, article 5069–1.03 was codified, with no substantive changes, as section 302.002 of the Texas Finance Code. *See* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3422. When a code provision conflicts with a statute enacted by the same legislature that enacted the code, the statute controls. TEX. GOV'T CODE ANN. § 311.031(d) (Vernon 1998). Thus, even though it appeared as part of the Texas Finance Code, article 5069–1.03 was no longer in effect after September 1, 1997. Because the trial court's judgment in this case was rendered in December 1998, article 5069–1.03 does not apply. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 n. 9 (Tex. 1998) (noting that prejudgment interest is governed by the law in effect at the time the trial court renders judgment).

■ When the Texas Legislature enacted the Texas Credit Title in 1997, it apparently superseded former article 5069–1.03 with article 5069–1C.002. In 1999, the Legislature amended Texas Finance Code section 302.002 to delete the

20. As amended, article 5069–1.03 stated:
When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable. Act of May 24, 1979, 66th Leg., R.S., ch. 707, 1979 Tex. Gen. Laws 1718 (repealed 1997).

language of former article 5069–1.03 and substitute the language of article 5069–1C.002. *See* Act of Apr. 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 127, 222–54. The Legislature noted that the purpose of this amendment was not to make a substantive change, but rather it was intended to conform the Texas Finance Code to the 1997 enactment of the Texas Credit Title. *See id.* Therefore, we look to article 5069–1C.002 to determine whether the option holders' contract claim is subject to a statutory rate of prejudgment interest.

The relevant portion of article 5069–1C.002 provides as follows:

> If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended by the creditor to the obligor beginning on the 30th day after the date on which the amount is due.

Act of June 2, 1997, 75th Leg., R.S., ch. 1396, § 1, 1997 Tex. Gen. Laws 5202, 5205 (codified at Tex. Fin.Code Ann. § 302.002 (Vernon Supp.2002)). The Texas Credit Title specifically excludes "judgment interest" from the definition of "legal interest" in this provision. *Id.*, 1997 Tex. Gen. Laws at 5203 (codified at Tex. Fin.Code Ann. § 301.002(a)(8)). "Judgment interest" is defined as "interest on a money judgment, whether the interest accrues before, on, or after the date the judgment is rendered."

*Id.* (codified at Tex. Fin.Code Ann. § 301.002(a)(7)). In addition, the statute excludes a judgment creditor from the definition of "creditor," and the definition of "obligor" excludes a judgment debtor. *Id.*, 1997 Tex. Gen. Laws at 5203–04 (codified at Tex. Fin.Code Ann. § 301.002(a)(3), (13)). Thus, we conclude that article 5069–1C.002, now Texas Finance Code section 302.002, does not apply to an award of prejudgment interest.

ACS argues that this construction of section 302.002 conflicts with this court's prior opinion in *Academy Corp. v. Interior Buildout & Turnkey Construction, Inc.*, 21 S.W.3d 732 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In *Academy*, a panel of this court held that a 1998 judgment for breach of contract was subject to the six-percent rate of prejudgment interest set forth in section 302.002 of the Finance Code. *Id.* at 744. Although *Academy* appears to cite the current version of section 302.002,[21] it provides no analysis explaining why that statute applied. Instead, it cites *Great American Insurance Co. v. North Austin Municipal Utility District No. 1*, in which the Texas Supreme Court applied article 5069–1.03 to a pre–1997 judgment. *See Academy*, 21 S.W.3d at 744 (citing *Great American*, 950 S.W.2d at 372–73). As explained above, article 5069–1.03 does not apply to post–1997 judgments. To the extent *Academy* stands for the proposition that the current version of Finance Code section 302.002 applies to a claim for prejudgment interest, we decline to follow it.[22]

**21.** We presume *Academy* was applying the current version of section 302.002 based on its cite to the version of the statute appearing in the 2000 supplement to the Vernon's bound volume of the Texas Finance Code. *See Academy*, 21 S.W.3d at 744. We note, however, that the opinion does not set forth the statute's language. Furthermore, the parties' briefs in that case referred only to the pre–1999 version of section 302.002, which had purportedly codified article 5069–1.03.

**22.** ACS also claims our decision conflicts with this court's opinion in *Certain Underwriters of Lloyd's London v. Smith*, 77 S.W.3d 859 (Tex. App.-Houston [14th Dist.] 2002, no pet.). In *Smith*, another panel of this court stated, in dicta, that the current version of section 302.002 is "a recodification of ... article 5069–1.03." *Id.* at 871. Because this statement was merely dicta, it is without precedential authority. *See American Golf Corp. v.*

Because section 302.002 does not govern the award of prejudgment interest in this case, we overrule ACS's complaint regarding the trial court's method of calculating prejudgment interest.[23]

### Conclusion

We conclude the trial court did not err in entering judgment in favor of Robert Butler on his claim for breach of the Original Agreement; however, the trial court erred in calculating his damages. We reverse those portions of the trial court's judgment (1) determining that the measure of damages for ACS's failure to transfer its stock is based on the value of the stock at the time of trial and (2) awarding Butler actual damages of $910,813.00. We remand to the trial court to recalculate Butler's damages based on the value of ACS stock on September 29, 1997. Because the trial court's award of prejudgment interest in a specified amount was presumably based on the amount of Butler's actual damages, we modify the judgment to delete the court's reference to Butler's prejudgment interest "being the sum of $19,463.94." As modified, we affirm the remainder of the trial court's judgment in favor of Butler.

The trial court also erred in entering judgment for Don Rice on his breach-of-contract claim because, as a matter of law, his options expired before they were exercised. We reverse the portion of the trial court's judgment in favor of Rice and re-

mand for consideration of Rice's fraud claim.

As to the remaining option holders, we conclude the trial court erred in granting summary judgment on their claim the Amendments should be rescinded for lack of consideration. Additionally, we conclude the trial court erred in granting summary judgment in favor of James Shield on ACS's affirmative defense of waiver. We reverse the judgment in favor of these option holders and remand for further proceedings consistent with this opinion.

EDELMAN, J., dissenting.

RICHARD H. EDELMAN, Justice, dissenting.

The dissenting opinion issued in this case on August 29, 2002 is withdrawn and replaced by this opinion.

I agree with the majority opinion except with regard to the trial court's actions at the pretrial conferences. In the absence of a no-evidence or traditional motion for summary judgment, admission, stipulation, or agreement of the parties on an issue, I do not agree that: (1) a trial court has authority in a pretrial conference to decide that sufficient evidence does not exist to allow that issue to be tried; or (2) such a decision by a trial court can be reviewed under a directed verdict standard.

Before a trial court may decide, by way of a summary judgment, that sufficient evidence does not exist to allow an issue to

---

*Colburn,* 65 S.W.3d 277, 281 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Furthermore, this court has since withdrawn its opinion in *Smith,* and thus that opinion has no precedential value. *Certain Underwriters of Lloyd's, London v. Smith,* 93 S.W.3d 657 (Tex. App.-Houston [14th Dist.] 2002) (order withdrawing opinions of April 25, 2002); *see Frizzell v. Cook,* 790 S.W.2d 41, 43 (Tex.App.-San Antonio 1990, writ denied) (stating that a

withdrawn opinion has no precedential value).

23. On appeal, the only issue regarding prejudgment interest is whether the trial court should have applied the statutory rate of six percent per year. We otherwise express no opinion on the trial court's calculation of prejudgment interest.

be tried, a motion must be filed at least 21 days before the matter is decided, during which time the non-moving party is on notice to submit evidence on the specified issue(s).[1] A motion for summary judgment must be filed by a party,[2] not *sua sponte* by the trial court. Moreover, a summary judgment may be granted and affirmed only on grounds expressly set forth in the motion[3] and can readily be reviewed on that basis. Unless a motion for summary judgment is properly granted, a party cannot be denied the right to present his evidence (or lack thereof) at a trial based on the insufficiency of that evidence.

By contrast, if a trial court is going to be allowed in a pretrial conference to decide whether sufficient evidence exists to allow an issue to be tried without a motion for a summary judgment being filed, there are no safeguards to assure that: (1) parties will be apprised in advance that evidence will need to be presented at the conference, on what issues, and in what forms, *i.e.*, affidavits or live testimony; (2) the no-evidence grounds will be those raised by an opposing party, not the trial court; or (3) the means will exist to create an adequate record of what and how evidence was presented. How then can a pretrial conference ruling be reviewed under a directed verdict standard, particularly if no actual trial ever takes place at which the adversely affected party can make an offer of proof or bill of exceptions?

The purpose of pretrial conferences is to simplify the trial to those issues not disposed of by admissions, agreement of the parties, or other rulings contemplated by the rules of procedure, such as summary judgments, not to circumvent the safeguards afforded by those rules.[4] Under the majority holding, pretrial conferences can be used as gatekeeping proceedings in which trial courts, rather than opponents, can put parties to task to demonstrate the sufficiency of their evidence before trials on those issues will be allowed. Even if there were merit in allowing such a gatekeeping step in the litigation process, the current lack of uniform procedures for doing so in a rule 166 pretrial conference make that an ill-suited mechanism for effecting it. Therefore, I would reverse and remand the judgment on the claims that were disposed of at the pretrial conferences other than by summary judgment, admission, stipulation, or agreement clearly reflected in the record.

1. *See* TEX.R. CIV. P. 166a(c), (i).

2. *See* TEX R. CIV. P. 166a.

3. *See* TEX.R. CIV. P. 166a(c); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002).

4. *See Provident Life & Accident Ins. Co. v. Hazlitt*, 147 Tex. 426, 429, 216 S.W.2d 805, 807 (1949) ("The purpose of this rule [166] is to simplify and shorten the trial and limit 'the issues for trial to those not disposed of by admissions or agreements of counsel.' . . . Of course, no controverted issues of fact could be adjudicated at this conference, but orders could be entered disposing of issues which are founded upon admitted or undisputed facts."); *Mason v. Tobin*, 408 S.W.2d 243, 244 (Tex.Civ.App.-Houston 1966, no writ) ("There is nothing in the rule [166] authorizing the trial court to determine the merits of the issues raised by the pleadings at a pre-trial hearing, where the parties do not agree to limit the issues, and the issues raised by the pleadings are not disposed of by admissions.").