**Affirmed and Memorandum Opinion filed May 2, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00215-CV

---

## LOST MAPLES GENERAL STORE, LLC AND WILLIAM BUTLER, Appellants

## V.

## ASCENTIUM CAPITAL, LLC, Appellee

---

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2016-16650**

---

### MEMORANDUM OPINION

In this commercial dispute between a buyer and a third-party lender, the buyer argues that the trial court erred by denying a request for a jury trial, by finding in favor of the lender's counterclaim and against the buyer's own claims, and by granting a partial motion for summary judgment. For reasons explained more fully below, we overrule all of these arguments and affirm the trial court's judgment.

# BACKGROUND

This case arises out of a seller's failure to deliver a product to a buyer, and the buyer's subsequent efforts to avoid its contractual obligations to the third-party lender who financed the undelivered product.

The buyer is Lost Maples General Store, LLC, which operates an independently owned gas station and convenience store. Lost Maples reached out to Argosy Foodservice, the seller, to inquire about the purchase of an ice machine. Argosy provided Lost Maples with a quote for $36,495, and Lost Maples agreed to that price. Argosy then referred Lost Maples to Ascentium Capital, LLC, the third-party lender, for a financing offer of 0% interest over two years.

To obtain that financing offer, Lost Maples executed two single-page contracts with Ascentium. The first contract was an Equipment Finance Agreement ("EFA"). Under the EFA, Lost Maples made an absolute and unconditional promise to remit twenty-four monthly payments to Ascentium at $1,520.63 per payment, for a grand total of $36,495.12. The second contract was a Commencement Agreement ("CA"). Under the CA, Lost Maples authorized Ascentium to release a lump-sum payment to Argosy. The CA also allocated to Lost Maples the risk that Argosy would fail to perform. In particular, the CA required Lost Maples to begin making immediate payments to Ascentium "notwithstanding the fact that not all items of Equipment have been delivered."

After Lost Maples executed the two contracts, Ascentium paid Argosy a negotiated price of $31,750.65, which amounts to a blind discount of 13%. The discount is "blind" because Lost Maples had no actual awareness of it. Had all parties duly performed, Ascentium stood to profit just over $4,744 from the transaction.

2

Not all parties performed, however. Argosy received the payment from Ascentium, but Argosy never delivered the ice machine to Lost Maples. Instead, after many weeks of refusing to respond to inquiries, Argosy sent notice to Lost Maples that it was going out of business. When this notification was received, Lost Maples had already made three monthly payments to Ascentium.

Lost Maples asked Ascentium to refund the money it had already paid. Ascentium refused, and demanded that Lost Maples honor its unconditional promise to pay off the debt.

Lost Maples then filed suit against Ascentium, but not Argosy. Lost Maples alleged several common law claims, including fraud and conspiracy. Lost Maples also asserted a statutory claim under the Deceptive Trade Practices Act ("DTPA"), and it sought declaratory relief under the Uniform Declaratory Judgments Act ("UDJA"). Ascentium counterclaimed for breach of contract. After a nonjury trial, the trial court disposed of all claims in favor of Ascentium.

## ANALYSIS

### I.    Did the trial court err by denying a jury trial on the DTPA claim?

Lost Maples requested, and paid the mandatory fee, to have a trial by jury on all of its claims for relief. But during a summary-judgment hearing, the trial court determined that the entire suit should be tried to the bench, based on the following provision in the EFA (emphasis in the original):

> **General.** This EFA shall be governed and construed under the laws of the State of New Jersey without reference to its principles of conflicts of laws. **You consent to the non-exclusive jurisdiction of courts located in New Jersey in any action relating to this EFA. You waive any objection based on improper venue and/or forum non [conveniens] and waive any right to a jury trial.**

After the summary-judgment hearing, Lost Maples filed a separate motion to have a jury trial on just its DTPA claim. Lost Maples advanced two arguments in support of its motion: first, the jury-waiver provision was not enforceable under Texas or New Jersey law; and second, even if the provision were enforceable, it did not encompass any statutory claims under New Jersey law.

Ascentium responded that the jury-waiver provision was enforceable, regardless of which state's law applied. Ascentium further argued that the jury-waiver provision was broad enough under New Jersey law to encompass statutory claims, including a DTPA claim.

The trial court agreed with Ascentium, and Lost Maples now challenges that ruling in its first issue on appeal.

## A.   Is the jury-waiver provision enforceable?

In its challenge to the enforceability of the jury-waiver provision, Lost Maples relies primarily on New Jersey law, and secondarily on Texas law. Although New Jersey law governs the construction of the contract, we cite to authorities from both states because both states' laws yield the same result.

Under New Jersey law, a court may consider the following set of nonexclusive factors when determining the enforceability of a waiver provision: (1) whether the provision was conspicuous, (2) whether the parties were represented by counsel, and (3) whether there was evidence of negotiation without substantial inequality in bargaining positions. *See Fairfield Leasing Corp. v. Techni-Graphics, Inc.*, 607 A.2d 703, 705 (N.J. Super. Ct. Law Div. 1992). Texas courts may consider the same factors (and more) when deciding the same question under Texas law. *See In re Frank Kent Motor Co.*, 336 S.W.3d 374, 378 (Tex. App.—Fort Worth 2011, orig. proceeding).

Lost Maples argues that the jury-waiver provision is not enforceable because it is not conspicuous. More specifically, Lost Maples complains that the provision is "virtually illegible"; that it is buried in the last paragraph of the EFA, which is titled "General" rather than "Waiver of Rights"; and because it addresses a plethora of rights, rather than just the right to a jury trial.

In support of these complaints, Lost Maples attached to its motion a low-resolution copy of the EFA. The text of that copy is blurry and difficult to read, but the trial court had access to a higher-resolution copy in the summary-judgment record, and the text of that copy is clear and legible. That copy also reveals that the jury-waiver provision is printed in bold and set apart from other typefaces, which means that it is conspicuous. Accordingly, there is support in the record for the trial court's ruling that the waiver provision is enforceable. *See Inv'rs Sav. Bank v. Waldo Jersey City, LLC*, 12 A.3d 264, 271 (N.J. Super. Ct. App. Div. 2011) (rejecting an enforceability challenge where the provision was "expressed in large and bold type"); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 134 (Tex. 2004) (orig. proceeding) (similar).

Lost Maples contends that the opposite conclusion is compelled by *Fairfield Leasing*, a New Jersey case. But the facts of that case are readily distinguishable. The waiver provision there was "1/10 of a centimeter in height, or approximately one-half the size of the letters produced by the typical typewriter." *See Fairfield Leasing*, 607 A.2d at 704. By contrast, the provision here was printed in a size at least twice as large, at two-tenths of a centimeter in height.[1]

---

[1] This measurement is based on the copy of the EFA appearing in the summary-judgment record. Ascentium suggests in its brief, without any proof, that this copy is a reduced version of the original, which contains even larger text.

In addition to its conspicuousness complaints, Lost Maples argues that the jury-waiver provision is not enforceable because it was not negotiated by legal counsel. Lost Maples asserted this point in its motion, but Lost Maples did not support that assertion with any attached evidence. In fact, Lost Maples failed to attach any evidence regarding the circumstances under which the EFA was executed. Without such evidence, we conclude that the trial court did not abuse its discretion by ruling that the jury-waiver provision was enforceable.[2]

## B.  Does the jury-waiver provision encompass the DTPA claim?

Both sides agree that New Jersey law governs the scope of the jury-waiver provision, but they disagree as to what New Jersey law requires in this case.

Under New Jersey law, a waiver of statutory rights "must be clearly and unmistakably established." *See Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*, 393 A.2d 267, 276 (N.J. 1978). Although there is no "magic words" requirement for being clear and unmistakable, a waiver should be written "in some general and sufficiently broad way" and "in plain language that would be clear and understandable to the average consumer." *See Atalese v. U.S. Legal Servs. Group, L.P.*, 99 A.3d 306, 314–16 (N.J. 2014).

Lost Maples argues that it did not clearly and unmistakably waive its right to a jury trial on its DTPA claim because the EFA's jury-waiver provision is silent as to statutory claims. Relying on *Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A.*, 773 A.2d 665 (N.J. 2001), Lost Maples argues that a jury-waiver

---

[2] During the trial on the merits, Bill Butler, who executed the EFA on behalf of Lost Maples, testified that other bold provisions in the EFA were noticeable and legible. Butler also established that he was a sophisticated businessman, and that he was able, without the aid of legal counsel, to negotiate other terms with Ascentium, like the amount of a document processing fee, and the authorization of ACH debits. The trial court did not have the benefit of Butler's testimony when it ruled on the motion for a jury trial. Nevertheless, Butler's testimony is consistent with the trial court's ruling that the jury-waiver provision is enforceable.

provision cannot encompass statutory claims unless the provision contains an express or general reference to statutory claims. This argument fails for two reasons.

First, Lost Maples overlooks an important factual component in *Garfinkel*. That case involved an arbitration clause in an employment agreement, and the clause stated that "any controversy or claim arising out of, or relating to, this Agreement or the breach thereof, shall be settled by arbitration." *Id.* at 668. Due to its limiting reference to "this Agreement," the New Jersey Supreme Court construed this arbitration clause as only encompassing contract claims. *Id.* at 672 ("That language suggests that the parties intended to arbitrate only those disputes involving a contract term, a condition of employment, or some other element of the contract itself."). The Court also explained that because the clause mentioned contract claims, but not statutory claims, there was no clear and unmistakable manifestation that the employee intended to waive his right to a jury trial on his statutory claim. *Id.* at 673.[3]

The current case does not fit within the *Garfinkel* paradigm because the EFA's jury-waiver provision does not identify any claims at all, whether they be contractual or statutory. Thus, there is no textual basis for concluding that Lost Maples waived its right to a jury trial in one type of claim, but not another.

This point dovetails into the second reason why we must reject the argument presented by Lost Maples: Under New Jersey law, a jury-waiver provision may encompass statutory claims so long as the provision is worded broadly and omits

---

[3] For a similar holding, see *Noren v. Heartland Payment Systems, Inc.*, 154 A.3d 178, 184 (N.J. Super. Ct. App. Div. 2017) (applying *Garfinkel* and holding that a statutory whistleblower claim did not fall within the scope of a jury-waiver provision that said "[Employer] and [Employee] irrevocably waive any right to trial by jury in any suit, action or proceeding under, in connection with or to enforce this Agreement" because there was no additional reference to statutory claims, and explaining that "by using 'this Agreement' as the defining threshold for all suits, actions and proceedings, the provision limits the category of disputes for which a jury trial is waived").

any limiting references to contract claims. That was the central holding of *Martindale v. Sandvik, Inc.*, 800 A.2d 872 (N.J. 2002), which Lost Maples wholly failed to address in its briefing.

*Martindale* also involved an arbitration clause in an employment agreement, but unlike *Garfinkel*, the employee there did not agree to arbitrate any controversy or claim "arising out of, or relating to [her] Agreement." Instead, the employee agreed to "waive [her] right to a jury trial in any action or proceeding related to [her] employment with [her employer]," and she further agreed "that all disputes relating to [her] employment with [her employer] or termination thereof shall be decided by an arbitrator." *Id.* at 875. The New Jersey Supreme Court held that this language was "sufficiently broad" to encompass the employee's statutory claims for family leave and employment discrimination. *Id.* at 883–84. The Court also distinguished *Garfinkel* on the ground that "the arbitration provision here does not contain any limiting references" to contract claims. *Id.* at 884.[4]

The EFA's jury-waiver provision contains no qualifications or limiting references whatsoever.[5] The jury-waiver provision plainly says, "You . . . waive any right to a jury trial." Given the breadth of this language, we conclude that Lost Maples clearly and unmistakably waived its right to a jury trial in all of its causes of actions, which means that the trial court did not err when it denied a jury trial on the DTPA claim.[6]

---

[4] For a similar holding, see *Leodori v. CIGNA Corp.*, 814 A.2d 1098, 1103 (N.J. 2003) (holding that an arbitration clause encompassed statutory claims because the provision expressly referred to claims under certain enumerated statutes and "any other federal, state, or local statute," and distinguishing *Garfinkel* on the basis that the clause there only referred to contract claims).

[5] There is, however, a limiting reference in the forum clause, which precedes the jury-waiver provision. In the forum clause, Lost Maples agreed that New Jersey courts would have non-exclusive jurisdiction over "any action relating to this EFA."

[6] Although we have faithfully applied New Jersey law to the disposition of this issue, we

## II. Did the trial court err by rendering judgment in favor of Ascentium on its counterclaim for breach of contract?

In its next issue, Lost Maples argues that it conclusively established four defenses to Ascentium's counterclaim. Even though Lost Maples cites in its brief to authorities from both Texas and New Jersey, Lost Maples represents that for each defense involved in this issue, there is no substantive difference between the laws of the two states. Because Lost Maples relies primarily on Texas authorities (and assigns almost all of the New Jersey authorities to footnotes), we too will refer to Texas authorities.

### A. Partnership by Estoppel or Quasi-estoppel

The first defense that Lost Maples asserts is that Argosy and Ascentium were partners, and by virtue of that partnership, Argosy's failure to deliver the ice machine amounted to a failure of consideration, which defeated Ascentium's counterclaim for breach of contract.

Lost Maples recognizes that Argosy and Ascentium were not partners at law, but Lost Maples believes that Ascentium is equitably estopped or quasi-estopped from denying that it was Argosy's partner.

Assuming without deciding that partnership by estoppel is a viable theory, Lost Maples had the burden of establishing the following elements: (1) a representation that the one sought to be bound is a partner, and (2) the one to whom

wish to add that New Jersey law and Texas law are not in accordance in their approach to waiver-of-rights provisions. Under Texas law, when a waiver-of-rights provision refers to a claim "arising out of the agreement" or "relating to the agreement," that language signifies breadth, not limitation. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 437, 441 (Tex. 2017) (holding that statutory and common law claims fell within the scope of a forum-selection clause that provided that Delaware courts would have exclusive jurisdiction over any dispute "arising out of this Agreement"); *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 195–96 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (holding that "arising out of or relating to" language "is recognized as broad language favoring arbitration").

the representation is made relied on the representation. *See CCR, Inc. v. Chamberlain*, No. 13-97-312-CV, 2000 WL 35721225, at *10 (Tex. App.—Corpus Christi June 1, 2000, pet. denied) (citing *Paramount Petrol. Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.), *abrogated by SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008)).

The trial court did not make findings addressing either of these elements. To prevail on its appellate complaint that the evidence conclusively established these elements, Lost Maples must show that the evidence is of such a character that reasonable people could not differ in their conclusions as to the existence of these elements. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). If the evidence shows that there was a conflict, then the elements were not conclusively established. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986).

Lost Maples produced affirmative evidence that Argosy and Ascentium held each other out as partners. For example, the vendor agreement between Argosy and Ascentium contains a paragraph that is captioned with the word "Partnership." Argosy also issued press releases announcing its partnership with Ascentium. But as Ascentium points out, the vendor agreement contains a separate paragraph clarifying that the two companies are not agents of each other. And Jerry Noon, a representative from Ascentium, testified that the press releases had not been authorized by Ascentium. Thus, these representations do not conclusively establish a partnership.[7]

Lost Maples also produced evidence that the logos of Argosy and Ascentium appeared on the same credit application that Lost Maples submitted to Ascentium.

---

[7] The trial court also found that Lost Maples had no knowledge of the vendor agreement when it executed the EFA and CA.

But Noon explained that Argosy's logo was present because Argosy requested a co-branded application to help with its marketing.

Lost Maples refers next to testimony from its sole owner, Bill Butler, who said that he remembered seeing Argosy and Ascentium described as partners on Argosy's website. However, any such representation would have been made by Argosy, not Ascentium.

Butler also testified that he had two telephone conversations with David Cuccolo, the vice president of franchise sales at Ascentium, and both times Cuccolo referred to a partnership with Argosy. But there was a conflict in the evidence on this point. Cuccolo testified in his deposition that Argosy was just a vendor, and that he has never referred to vendors as legal partners of Ascentium. A separate vice president at Ascentium added that even if the word "partnership" had been used, its meaning is just "a generic term for doing business with someone."

Even if there had been no conflict in the evidence, Lost Maples could not establish its estoppel defense unless it used due diligence in ascertaining the truth of the statements upon which it relied. *See Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968). Lost Maples cannot establish this due diligence because the EFA, like the vendor agreement, plainly reveals that Ascentium was not acting on Argosy's behalf. Specifically, Ascentium made the following representation in the EFA: "the Supplier [i.e., Argosy] is not our agent nor are we its agent."

As for quasi-estoppel, that doctrine precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies when it would be unconscionable to allow a person to maintain a

11

position inconsistent with one to which he acquiesced, or from which he accepted a benefit. *Id.*

This theory fails for the same reasons as partnership by estoppel: Ascentium produced evidence that it did not hold itself out as a legal partner with Argosy, and the EFA disclaimed any such relationship. Accordingly, Lost Maples did not establish its partnership defense as a matter of law.

## B. Unconscionable or Void as Against Public Policy

Unconscionability includes two aspects: (1) procedural unconscionability, which refers to the circumstances surrounding the formation of the contract, and (2) substantive unconscionability, which refers to the fairness of the contract itself. *See In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002) (orig. proceeding). The trial court did not specifically address either aspect in its findings of fact and conclusions of law, but Lost Maples contends that both aspects were established as a matter of law.

Lost Maples asserts that the EFA and the CA are procedurally unconscionable because they "[1] contain confusing, hidden, and unduly complex contract terms; [2] were procured through bargaining tactics involving material misrepresentations and false statements; [3] were executed by a 69-year-old man whose personal and business affairs were largely handled by his assistant; and [4] had terms and conditions set forth in small print that was barely legible."

As for the first point, Lost Maples does not identify which terms are "confusing, hidden, and unduly complex," nor does Lost Maples explain how those terms render the contracts procedurally unconscionable, as opposed to substantively unconscionable. The second point is just a repackaged complaint that Argosy and

Ascentium were partners, which we have already considered and rejected. And the third and fourth points are not born out by the evidence.

The record shows that Butler executed the contracts. Butler was a sophisticated party who owned multiple businesses. He received the contracts over email, and he was afforded ample time to review them and seek legal counsel before signing them. He never once complained that the contracts were illegible. To the contrary, he negotiated their terms with Ascentium. He even considered the option of paying cash for the ice machine and walking away from the financing offer altogether. These circumstances negate any claim of procedural unconscionability. *See In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006) (orig. proceeding) (rejecting a procedural unconscionability challenge to an arbitration provision even though the challengers were unsophisticated and had executed a contract of adhesion).

Lost Maples argues next that the contracts are substantively unconscionable because they required Lost Maples to deem acceptance of the ice machine before it was delivered, and then they required Lost Maples to pay for the ice machine even after receiving notification that it would never be delivered. For these same reasons, Lost Maples also argues that the contracts are void as against public policy.

These arguments essentially complain about the allocation of risk. But there is nothing unconscionable or against public policy by allowing sophisticated parties to allocate risks as they see fit. *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Texas strongly favors parties' freedom of contract. . . . Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

Lost Maples responds that Ascentium created an unnecessary risk because it had the power under its vendor agreement to withhold payment until after delivery

13

of the ice machine was confirmed, yet Ascentium failed to exercise that power or otherwise take steps to prevent a loss to Lost Maples. This argument also fails. Ascentium promised under its vendor agreement that it would promptly pay Argosy after receiving "a satisfactory confirmation, if needed, from the Customer confirming that collateral has been delivered, installed and accepted." Ascentium did not need confirmation in this case because Lost Maples deemed acceptance of the ice machine before it was delivered. And Lost Maples knew from the two contracts that it signed that it would still have to pay if delivery did not occur: the EFA provided in bold type that Lost Maples had an "absolute and unconditional" obligation to pay, and the CA provided that this obligation commenced immediately even though the ice machine had not been delivered.

We are not unsympathetic to the circumstances of Lost Maples. Without question, Lost Maples was wronged in this case by Argosy. But instead of pursuing Argosy, Lost Maples would have us rescind its contracts with Ascentium, effectively shifting the loss to a third party who already performed. That outcome cannot be justified under the terms of the contract or as a matter of policy. *See Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 671 (N.J. 1985) ("As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement.").

## C.    Conditions Precedent

For its third defense, Lost Maples argues that Ascentium cannot recover on its breach of contract because "the EFA and CA were subject to express or implied conditions precedent—specifically, that the vending machine would be delivered to, and accepted by, Butler." This argument fails as a matter of law, for reasons we have just explained. The EFA provides: "Your obligation to pay all amounts payable

hereunder is absolute and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason." And the CA provides:

> You acknowledge and agree that notwithstanding the fact that not all items of Equipment have been delivered to and accepted by you as of the date set forth above, the terms and conditions of the [EFA], including your obligation to pay all amounts of rent or debt service set forth in the [EFA], shall commence immediately and, except as otherwise specifically set forth in this CA, irrevocably.

Thus, there was no condition precedent. Lost Maples was required to pay even if the ice machine was not delivered.[8]

### D.    Material Breach

For its last defense, Lost Maples argues that Ascentium could not recover on its counterclaim because it materially breached the contracts in two ways: first, by not ensuring the delivery of the ice machine; and second, by not making a pro-rata price adjustment.

The first argument fails because it is a repackaged complaint about conditions precedent. Ascentium had no duty to deliver the ice machine or ensure its delivery. Lost Maples, by contrast, had a contractual obligation to pay for the ice machine, even if it was not delivered.

The second argument is based on the following provision in the CA:

> The [EFA] contemplates a pro-rata adjustment to the payments owed by you under the [EFA] in the event the purchase price of the Equipment and other amounts, if any, paid by us on your behalf are higher or lower than those on which the payments set forth in the [EFA] are based. Following the delivery and acceptance of all items of

---

[8] The trial court made the same conclusion of law: "Delivery of the Vending Machine is not a condition precedent to Defendant's right to receive payments or enforce the EFA."

Equipment set forth in the [EFA], we shall make any necessary adjustments to the payments as contemplated by the [EFA].

Lost Maples contends that Ascentium breached this provision when Ascentium negotiated a blind discount with Argosy and then failed to pass along that discount to Lost Maples in the form of a price adjustment. But as we construe the provision, Ascentium would only be required to make a price adjustment if the purchase price of the ice machine changed as between Argosy and Lost Maples, which did not happen.

The alternative interpretation proposed by Lost Maples would effectively mean that Ascentium would never turn a profit at a 0% interest rate. To the contrary, Ascentium would actually lose money due to the time value of money, which is commercially unreasonable.[9]

Even if we were to determine that Ascentium breached the terms of its own CA, Lost Maples would only be excused from its obligation to pay Ascentium if the breach were material. The materiality of a breach is usually an issue to be determined by the trier of fact. *See Bartush-Schnitzius Foods Co. v. Cinco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam).

The trial court here did not make a finding on the materiality of any breaches by Ascentium. Instead, it found that Ascentium had *not* breached the CA. However, the trial court did conclude that "the blind discount given Defendant by Argosy was immaterial to Plaintiffs' decision to purchase the Vending Machine at the Grand Total price and to finance that amount through Defendant." If the blind discount was immaterial, then so too must be any failure by Ascentium to pass on that discount to Lost Maples in the form of a price adjustment.

---

[9] Butler was aware of this concept, too. He admitted in his testimony that he could never obtain a loan at 0% interest from a bank.

### III. Are the trial court's findings against Lost Maples on its own affirmative claims for relief supported by factually sufficient evidence?

Lost Maples asserted various common law and statutory claims against Ascentium. The trial court determined, and the parties agreed, that Texas law should apply to all of these claims. We accordingly apply Texas law in our discussion of this next issue, where Lost Maples challenges the factual sufficiency of the trial court's adverse findings.

#### A. Fraud

The trial court found that "Defendant did not induce Plaintiffs to enter into the EFA or Guaranty through fraud, negligent or intentional misrepresentation, or concealment of a material fact." Lost Maples challenges this finding and the trial court's implicit rejection of the claim that Ascentium had misrepresented that it was legally partnered with Argosy.

When a party attacks the factual sufficiency of an adverse finding on an issue for which the party had the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We consider and weigh all of the evidence in a factual-sufficiency review, not just the evidence in support of the challenged finding. *Id.* We may only set aside a judgment for factually insufficient evidence if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*

There was conflicting evidence on the partnership issue, which we discussed at length in Part II.A of this opinion, and need not repeat here. Based on our review

17

of the record, we cannot say that the trial court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.[10]

Lost Maples challenges the trial court's finding for a separate reason, arguing that there is overwhelming evidence that Ascentium "repeatedly misrepresented [that it was] financing the purchase of the vending machine on a 0% basis for 24 months for a purchase price of $36,495.00 when, in reality, Ascentium had arranged with Argosy to pay only $31,750.65 and make a profit of at least 13% on the transaction." But there were no such misrepresentations. Ascentium's statements tracked the terms of the EFA.

Lost Maples appears to be complaining about the trial court's rejection of its claim for fraud by nondisclosure. The trial court addressed that claim in a separate set of findings, which we reproduce here:

> 28. To induce Defendant to finance its offers to customers of 0% financing, Argosy offered Defendant a "blind discount," whereby Argosy would accept a reduced payment from Defendant in exchange for accepting payment of the purchase price over time by Argosy's customer.
>
> 29. Blind discounts are a common method used in financing that allow sellers to offer 0% financing to customers, and there is no evidence that the blind discount offered by Argosy is fraudulent, misleading, deceptive, or otherwise wrongful.
>
> 30. Plaintiffs agreed to the purchase price of the Vending Machine because William Butler considered it a good deal. The amount later paid by Ascentium to Argosy was not relevant to that decision.

---

[10] Perhaps more importantly, Lost Maples cannot establish that it justifiably relied on any false representations of a partnership because Ascentium specifically disavowed in the EFA that it was Argosy's agent or that Argosy was its agent. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, — S.W.3d —, 2019 WL 847845, at *5 (Tex. Feb. 22, 2019) (if the terms of the contract contradict the alleged misrepresentations, then the fraudulent inducement claim must fail because justifiable reliance is negated as a matter of law); *see also* Tex. Bus. Org. Code § 152.301 ("Each partner is an agent of the partnership for the purpose of its business.").

Lost Maples suggests in its brief that Ascentium had a duty to disclose its discount, but Ascentium produced evidence to the contrary, showing that the discounts are "blind" for a reason. Noon, the Ascentium representative, testified that blind discounts are "very common" in the financing industry.[11] He explained that "it wouldn't make sense" for lenders to disclose blind discounts to customers. He also added: "I think it would be very naïve for someone to believe that banks are lending money at zero percent and not making any money."

Lost Maples has not shown in the record that it ever asked Ascentium to reveal its discounts or profits. Without such evidence, Lost Maples cannot demonstrate that the trial court's findings are supported by factually insufficient evidence.

## B.     DTPA

Lost Maples argues next that the overwhelming weight of the evidence shows that Ascentium violated the DTPA by engaging in false, misleading, or deceptive acts. *See* Tex. Bus. & Com. Code § 17.50(a)(1). The factual bases for this argument are that (1) Ascentium misrepresented that it was partnered with Argosy, (2) Ascentium failed to disclose the blind discount it received from Argosy, and (3) Ascentium failed to disclose that it intended to enforce its contracts even if the ice machine was never delivered by Argosy.

The first two points are just repackaged complaints about fraud, which we must reject for the reasons stated above. The third point fails as a matter of law because Ascentium had no duty to disclose that information, which was already apparent from the face of the two contracts.

---

[11] Lost Maples argues that this testimony cannot be considered because Noon was not designated as an expert, but this argument was not preserved by a timely trial objection. *See* Tex. R. App. P. 33.1.

Lost Maples also argues that the overwhelming weight of the evidence shows that Ascentium violated the DTPA by engaging in an unconscionable course of action. *Id.* § 17.50(a)(3). Lost Maples explains that "the CA and EFA themselves are direct evidence of Ascentium's unconscionable actions." Lost Maples goes on to assert that those contracts are illegible, and that their terms are substantively unconscionable. Once again, Lost Maples has simply repackaged an earlier complaint. Based on the ample evidence that Lost Maples entered into the contracts after Butler, a sophisticated businessman, had an opportunity to review their terms, we conclude that the trial court's rejection of this DTPA claim is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

## C. Conspiracy

Lost Maples claimed that Ascentium had conspired with Argosy to commit fraud and violations of the DTPA by concealing information about the blind discount. The trial court rejected that claim, and now Lost Maples contends that the evidence is factually insufficient to support the trial court's ruling because there was uncontroverted evidence that Ascentium would never disclose its negotiated prices, even when asked by the customer.

Because we have already determined that the trial court's rejection of the fraud and DTPA claims is supported by factually sufficient evidence, we must likewise conclude that the conspiracy claim fails as a matter of law. *See Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008) ("Conspiracy is a derivative tort."); *Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 642 (Tex. App.—Fort Worth 1998, no pet.) ("A conspiracy claim fails as a matter of law if the underlying claim has failed.").

## D. UDJA

In its next challenge, Lost Maples argues that "the EFA and CA should have been interpreted and construed, particularly with regard to the terms that involved the delivery and acceptance of the equipment as a condition or requirement for the payment of money to Ascentium." This point does not involve a challenge to the factual sufficiency of the evidence, and it fails as a matter of law. As we have already explained, Lost Maples has an absolute and unconditional obligation to repay Ascentium under the plain terms of the contracts. The trial court also concluded as much in its findings of fact and conclusions of law.[12]

## IV. Did the trial court err by granting a partial summary judgment?

Lost Maples pleaded the affirmative defense of mutual mistake, and Ascentium challenged that defense by moving for a no-evidence summary judgment, asserting among other points that Lost Maples had no evidence that both parties had the same misunderstanding of the same material fact (represented in this case to be that Argosy would fail to deliver the ice machine). Lost Maples filed a lengthy response, spanning more than two hundred pages, but the trial court granted a partial summary judgment in Ascentium's favor.

Lost Maples now challenges that ruling, arguing that a fact issue precluded a summary judgment. But the only evidence cited by Lost Maples in its appellate brief is from the trial on the merits, not the summary-judgment response. That evidence is outside the scope of our review. *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *see also Gleason v. Isbell*, No. 14-

---

[12] The trial court concluded that the contracts are "unambiguous," that "Plaintiffs' obligations to make the payments required by the EFA are not contingent upon Argosy's delivery of the Vending Machine," and that these obligations are "absolute, irrevocable and unconditional."

03-00166-CV, 2004 WL 1205784, at *4 (Tex. App.—Houston [14th Dist.] June 3, 2004, pet. denied) (holding that the appellate court has no duty to conduct its own independent search of a voluminous record to determine whether a summary judgment should be reversed).

Moreover, the cited evidence is just a deposition excerpt from an Ascentium representative, who testified that actual receipt of the ice machine was important to the transaction. Even if this evidence were within the scope of our review, it would not raise a genuine issue of material fact as to mutual mistake because the deposition testimony concerns a future event, not a present fact. *See Walden v. Affiliated Comput. Servs., Inc.*, 97 S.W.3d 303, 326 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("To prove a mutual mistake, however, the evidence must show that both parties were acting under the same misunderstanding of the same material *fact*. Here, the alleged "mistake" did not concern any presently existing fact, but rather a belief regarding some future occurrence."); *accord Reinhardt v. Wilbur*, 105 A.2d 415, 417 (N.J. Super. Ct. App. Div. 1954).

## CONCLUSION

The trial court's judgment is affirmed.


/s/     Tracy Christopher
        Justice


Panel consists of Justices Christopher, Bourliot, and Poissant.

22